FILED
6/9/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

RECEIVED
6/8/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

VIVEK SHAH,
      Plaintiff,

v.

JPMORGAN CHASE BANK, N.A.,
      Defendant.

20CV3355
JUDGE FEINERMAN
MAGISTRATE JUDGE KIM

Civil Action No. _____

## VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES

### *JURY DEMANDED*

### PRELIMINARY STATEMENT

1.      J.P. Morgan Chase, N.A. ("Chase") is a convicted felon. So is Plaintiff Vivek Shah. Yet, Chase categorically discriminates felons from opening and maintaining any of its checking or credit accounts. It maintains and enforces a policy of automatically excluding any person with a record of a felony conviction and certain other types of criminal history from accessing its checking and credit products. Plaintiff, proceeding *pro se*, brings this suit against Defendant under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 et seq., Regulation B promulgated thereunder, 12 C.F.R. § 1002, and the civil remedies provided in the Racketeering Influenced and Corrupt Organizations (RICO), 18 U.S.C. § 1961 et seq. to (1) prevent Defendant from continuing its discriminatory and unlawful conduct against Plaintiff and those similarly situation, and to ensure that Plaintiff and others injured by the anti-felon policy – who are disproportionately of color – will have a meaningful opportunity to have access to essential banking services, and (2) redress the harm Plaintiff has suffered as a direct result of Defendant's conduct.

2.     The anti-felon policy and practice's disproportionate, adverse impact on people of color violates the Equal Credit Opportunity Act. There is a readily available and less discriminatory alternative to an automatic blanket ban on felonies and other criminal histories for dealing with any potential concerns about applicants with a criminal record. Instead of automatically excluding every applicant within the scope of its policy, Defendants can and are legally required to individually assess potential applicants with a felony or other covered criminal history by considering factors directly relevant to the prospective applicant's credit history. Individualized assessments would permit Defendant to carefully review the credit history of applicants that would also permit prospective applicants who have a criminal record, but who pose no threat to the bank to obtain credit.

3.     Defendant's decision to maintain a far-reaching blanket ban, despite various industries' rejection of such bans due to their discriminatory impact, indicates that this policy not only has an unlawful disparate impact, but was motivated by an intent to block people who are of color from obtaining credit.

4.     Defendant's discriminatory policy and practices directly prevent individuals like Plaintiff who are reentering society after time in prison from securing any tangible thing of value, whether it is housing, medical supplies or clothing, that is crucial to their successful reintegration. Defendant's policy also impacts individuals with a prior conviction long after an individual has successfully reentered the community.

## NATURE OF THE ACTION

5.     Plaintiff seeks injunctive, monetary, and declaratory relief against Defendant for engaging in a practice of illegal discrimination on the basis of color at the banks that Defendant owns and operates.

6.     An applicant who has a criminal history within the scope of Defendant's policy is automatically barred regardless of the nature of the conviction, the amount of time that has lapsed since the conviction, evidence of rehabilitation, prior credit or banking history, or any other factor related to whether the person poses a threat to Defendant's business. As a result, an elderly person with a decades-old drug conviction is treated identically to a person with a very recent violent conviction: both are barred without further review.

7.     As a direct result, applicants with a criminal record are either (1) deterred from ever applying to Defendant's credit products since it would lower their credit score with the credit bureaus; or (2) automatically denied because of the anti-felon policy.

8.     Analysis of criminal records and other data shows that the Defendant's policy, though facially neutral, has a severe disparate impact on the basis of color. Today, people of color make up around 23% of the U.S. population. Yet, they account for approximately 40% of all convicted felons in the U.S. About 70 million Americans have a criminal record.

9.     The State of Illinois has a population of 12.7 million people, consisting of 61% Whites and 39% people of color.

10.    In Cook County, Illinois, 42% of the residents are White, but account for only 10% of all persons that have received a criminal sentence in the county.

11.    An analysis of the 297 DNA exonerations revealed that people of color make up approximately 70% of those proven innocent through DNA testing. People of color are 7 times more likely to be wrongfully convicted or murder than White people. People of color serving time for sexual assault is 3.5 times more likely to be innocent than a White sexual assault convict. Innocent people of color are 12 times more likely to be convicted of drug possession than innocent White people.

12.     90% of Defendant's Board of Directors are White. 100% of the Defendant's Operating Committee is White.

13.     The Equal Credit Opportunity Act prohibits the application of any policy or practice that has a disparate impact unless it is necessary to achieve a substantial, legitimate, nondiscriminatory business interest that cannot be satisfied by an alternative that has a less discriminatory effect.

14.     Defendant's policy and practice is not necessary to achieve a substantial, legitimate, nondiscriminatory business interest. A less discriminatory alternative for dealing with any potential concerns raised by applicants with criminal records is available to Defendant.

15.     Instead of automatically excluding every applicant covered by their far-reaching policy and practice, Defendant should individually assess an applicant with a criminal history by considering factors directly relevant to the applicant's qualifications for credit such as the nature of the conviction or conduct, when it occurred, their age at the time the conduct occurred, their post-conviction and post-release conduct, evidence of their rehabilitation, evidence of whether their credit approval would create a direct threat to Defendant's business, their credit history, and other relevant factors. When considered in their totality, such an individualized assessment enables a creditor to make a reasoned decision about a particular applicant's suitability for credit approval.

16.     The more tailored approach required by an individual assessment protects financial and business interests of Defendant, yet it is less discriminatory and exclusionary because it reduces the number of colored people who are categorically barred from being extended credit.

17.     Plaintiff brings this action to address Defendant's discriminatory and unlawful conduct and to redress the harm he has suffered and will continue to suffer as a direct result of that conduct, absent relief.

## PARTIES

18.     Plaintiff Vivek Shah is a natural-born U.S. citizen. He is a non-White male. In August 2012 he was arrested by the FBI for attempting to extort money from several individuals. He was sentenced in the Southern District of West Virginia to 87 months in prison. On February 4, 2019 he was released from prison, and on February 4, 2020 his supervision was terminated by Honorable Jorge L. Alonso of this Court.

19.     Defendant JPMorgan Chase, N.A. is an American multinational investment bank and financial services holding company headquartered in New York, NY. JPMorgan Chase is ranked by S&P Global as the largest bank in the United States and the sixth largest bank in the world by total assets of US$2.687 trillion.

20.     In January 2017 Defendant plead guilty in the District of Connecticut to one felony count of conspiring to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange (FX) spot market, in violation of 15 U.S.C. § 1. Defendant was placed on a 3-year term of probation and $550 million in fines. Presumably, its term of probation expired in January 2020.

21.     Prior to Defendant's 2017 conviction, it entered into a *nolle prosequi* agreement with the United States for a $1.7 billion penalty stemming from two felony violations of the Bank Secrecy Act.

22.     In acting or omitting to act as alleged herein, Defendant was acting through its employees and/or agents and is liable on the basis of the acts and omissions of its employees and/or agents.

23.     In acting or omitting to act as alleged herein, each employee, officer or agent of Defendant was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Defendant as principal.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this matter under 15 U.S.C. § 1691e, 18 U.S.C. § 1964, and 28 U.S.C. § 1343.

25.     This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Fed. Rules of Civ. P.

26.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant is a national bank that is chartered and supervised by the Office of the Comptroller of the Currency, an agency in the U.S. Treasury Department, pursuant to the National Bank Act. Defendant has bank branches throughout the Northern District of Illinois where Plaintiff has transacted with Defendant. Plaintiff is a resident of Schaumburg, IL. A substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

**I.      Defendant's Conduct Leading to the Instant Suit**

27.     In or around the year 2004, Plaintiff opened a Checking Account ("First Account") at a Washington Mutual bank in Schaumburg, IL. In or around 2008, Defendant

Chase bank purchased and rebranded Washington Mutual to Chase. Plaintiff's First Account was therefore converted to a Chase checking account.

28.     In or around the year 2010, Plaintiff applied for and was approved for a Chase Sapphire Preferred Credit Card ("Sapphire Card").

29.     On August 10, 2012, Plaintiff was arrested by the FBI on allegations that he attempted to extort money from several individuals. None of Plaintiff's conduct or allegations related to any of his banking relationship with Chase. At that time, the First Account had a deposit balance of approximately $261. Additionally, the Sapphire Card did not have any balance due.

30.     In or around October 2012, while in jail awaiting trial, Plaintiff provided his father a handwritten, notarized power of attorney ("POA"), that mentioned, *inter alia*, that he was in jail and could not manage his accounts personally at the moment. The POA provided his father with broad powers to take any action on Plaintiff's accounts related to the First Account and the Chase Sapphire Credit Card.

31.     In or around October 2012, Plaintiff's father walked into a Chase bank branch with the notarized POA. Plaintiff has no further knowledge of what transpired at the bank branch.

32.     In or around September 2013, Chase closed both the First Account and Sapphire Card.

33.     In or around February 2019, Plaintiff walked into a Chase bank branch in Schaumburg, IL upon discovering an unclaimed property with the California State Controller. A female employee of the branch assisted Plaintiff with having a $261 check re-issued to him. The employee stated to Plaintiff that the $261 amount was the leftover balance from the First

Account upon closure of that account. Plaintiff asked the employee for the reason why it was closed, to which she stated that there was no particular reason stated other than a note that read that Plaintiff was not to be allowed to open any account with Chase.

34.     In or around October 2019, Plaintiff was added as an Authorized User to the following credit cards issued by Chase:

     a.  United Explore MileagePlus, with the primary account holder being his father

     b.  British Airways, with the primary account holder being his mother

     c.  Sapphire, with the primary account holder being his brother

35.     On or around February 1, 2020, Plaintiff applied with Chase for a credit card ("Chase Credit Card") which was later denied under the guise that he had insufficient credit history. The denial was made despite Plaintiff having substantial credit history and a FICO score of around 740 at the time of application.

36.     On or around February 4, 2020, Plaintiff successfully opened a Business Checking Account under his own name at Chase.

37.     On or around April 4, 2020, Plaintiff applied for a Paycheck Protection Program ("PPP") loan under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") with Chase.

38.     On or around April 17, 2020, Chase issued a letter to Plaintiff denying his PPP loan request, stating: "After a recent review of your accounts, we have decided to end our relationship with you."

39.     On or around April 17, 2020, Chase issued a letter to Plaintiff's father, mother, and brother stating that it has closed the cards that were issued to Plaintiff as an Authorized User. It did not provide any reason whatsoever as to why the cards were terminated.

40. On or around April 20, 2020, Plaintiff applied for and was approved for an Amazon Prime Rewards Visa Signature Card ("Amazon Card") that was issued by Chase. The Amazon Card was approved after Chase had pulled his credit history reports from Experian and Transunion.

41. On or around April 21, 2020, Chase issued a letter to Plaintiff regarding his Business Checking Account, which stated: "After a recent review of your account, we have decided to end our relationship with you."

42. On or around June 1, 2020, Chase closed Plaintiff's Amazon Card under the guise that:1) there was a "rapid increase in revolving balances" and 2) there were "too many requests for credit or reviews of credit." Chase issued the letter despite the Amazon Card balance being paid in full on or before its due date, and Chase having no new information/credit-pull from which it could have determined that there were too many requests/review of credit. In fact, Plaintiff has on occasion even made *overpayments* of the balance due and thus has had a *negative* Amazon Card balance. Plaintiff requested Defendant to reconsider and reinstate the Amazon Card.

43. On June 4, 2020, Chase issued a letter denying reinstatement of the Amazon Card, yet again, under the same guise that: 1) there was a "rapid increase in revolving balances" and 2) there were "too many requests for credit or reviews of credit." In fact, on June 4, 2020, the Amazon Card had a current balance of *negative* $85.81. In the history of the Amazon Card, Plaintiff at most utilized just 16.25% of the approved credit limit. Moreover, Chase did not check any of Plaintiff's credit reports again through which it could glean new information that could form the basis of the denial.

## II.    Anecdotes from Similarly-Situated Felons

44.    In or around 2008, Kirk Radomski, a convicted felon with good credit history, had his credit card terminated that was issued to him by Chase, since Chase found out that he was a felon.

45.    Unnamed Person #1 has a felony conviction stemming from conduct that occurred in 2017. In or around March 2020, this person applied for a credit card at Chase, was approved for it, but two weeks later received a letter that the account was terminated.

46.    Unnamed Person #2 has a felony conviction and opened an account at Chase in or around March 2020; however, approximately 10 days later Chase closed the account.

47.    Unnamed Person #3, a convicted felon, applied for and was approved for an Amazon Visa credit card issued by Chase in or around 2015. Approximately 5 months after its issuance and usage, the person received a letter in the mail stating that the Amazon Visa credit card was being closed because "continuing our relationship creates possible reputational risk for our company."

48.    Unnamed Person #4, a convicted felon, applied for and was approved for a credit card issued by Chase in or around 2015. Approximately 6 months after regular use and payments, Chase cancelled it.

## III.    Defendant's Policy Prevents Any Applicant with a Criminal Record from Being Considered for its Products and Services

49.    Defendant practices and has a non-public policy of terminating any and all banking relations with any person who it finds out has a felony or other criminal histories. The policy and practice even applies to those people that were charged with a felony but were never convicted.

50.     Defendant's policy and practices are an outwardly neutral practice that automatically excludes all applicants that have a felony conviction and other criminal histories, and even some people who have only been charged with but not convicted of criminal conduct. This policy and practice is consistently applied and enforced.

**IV.     Defendant's Policy Prevents People with Criminal Records from Obtaining Essential Banking Services**

51.     The harm inflicted by discriminatory criminal records policies like Defendant's is significant, not only in terms of the sheer number of people affected, but also in terms of the consequences, for the wellbeing of our communities.

52.     When banks categorically discriminate felons, they are left with no more choices but to revert back to criminal activity. Companies such Chase never give felons a second chance. Thus society ends up paying the price of Chase's discrimination.

53.     Banking services are essential and are a particularly crucial need for individuals reentering their communities immediately after time in prison.

54.     Research shows that success in opening a bank account and securing credit are critically important to allowing reentrants to gain employment, government benefits, and other community ties. Successful reintegration is not just a concern for those who return from prison: it is also a matter of public safety and economic necessity. Reducing recidivism is critical for community safety; providing effective rehabilitation and skill development for those incarcerated and formerly incarcerated is critical to strengthening households and the economy. Other research has shown reentrants who do not have access to essential banking services are more likely to recidivate than those who are able to. Recidivism additionally impacts the whole surrounding community.

55.     Automatic criminal history bans directly prevent reentrants from obtaining such essential banking services, whether immediately after release from prison or decades later, without giving any consideration to the particular circumstances of a person trying to cash a check or secure credit to start a legitimate business. Banks such as Chase that make it extremely difficult on reentrants to live a law-abiding life, unwittingly push them in the direction of recidivism. This complete disregard for individual circumstances cannot be justified under the law. Moreover, it needlessly injures formerly incarcerated individuals, their communities, and organizations like Plaintiffs that are committed to preserving access to essential necessities of life.

56.     Defendant's choice to maintain the overly broad and discriminatory policy and practices also reflects a substantial departure from usual industry practices, which raises an inference of discriminatory intent. Defendant's outright rejection of applicants with felony and other convictions and arrests is entirely counter to normal business practices in the credit lending industry. In the normal course of business, creditors are highly motivated to get people in the door to obtain credit. Bank such as Defendant even offer hundreds of dollars of cash and rewards incentives to people as an introductory bonus. Defendant's policy and practices instead assures that a group of people - disproportionately people of color - has no reason to bank with Defendant.

57.     Departures like this from industry norms suggest illicit motive.

58.     In light of these facts, there is no non-discriminatory explanation for why Defendant deliberately choses and continues to implement the policy and practices over an individualized screening practice. Rather, these facts collectively support the inference - indeed,

they strongly suggest - that Defendant fully understands the unnecessary and unlawful disparate impact of its discriminatory impact.

59.     In fact, Jamie Dimon, the Chief Executive Officer of Defendant-company, has publicly said that "How we treat felons after they've paid their price is completely unfair."

## V.     Defendant's Policy Disproportionately Affects People of Color and Constitutes Unlawful Discrimination

60.     Facially neutral credit lending practices that have a disparate impact on the basis of color are prohibited under the Equal Credit Opportunity Act unless they are necessary to achieve a substantial, legitimate, nondiscriminatory business interest that cannot be served through a less discriminatory alternative practice. Policies that automatically deny credit to people with records of felony convictions or other criminal history, including Defendant's policy and practices that are maintained and enforced by Defendant, have a severe disparate impact on people of color at the national, state, and local levels, and are unlawful under this standard.

61.     Because the proportion of people with criminal records in Cook County varies widely by skin color, Defendant's policy and practices bars otherwise-qualified people of color from obtaining credit at a rate of close to nine times the rate at which otherwise-qualified Whites are excluded. Defendant's policy and practices are the direct cause of this disparate impact.

62.     Defendant's policy is overbroad and cannot be justified. Protecting the bank's reputation, safety or property is not a valid reason for an automatic ban, as most credit-applicants with criminal backgrounds do not pose a more significant risk to creditors than credit-applicants without criminal backgrounds. The protection of the reputation of the bank cannot be used to justify a policy that categorically banks all people with felonies or other types of criminal history

without any attempt to distinguish between past criminal conduct that presents a risk to Defendant's assets or reputation and past criminal conduct that does not.

63.     Any legitimate concerns, including protecting safety or property, can be satisfied by a readily available and less discriminatory policy: giving individualized consideration to each applicant's circumstances and credit history.

**VI.     Automatic Credit Bans Based on Criminal History Disproportionately and Severely Impacts People of Color Nationally**

64.     Nationally, more than 625,000 inmates are released from confinement each year, and they become targets of automatic criminal history bans at precisely the tie then they need credit to reintegrate into society.

65.     The sheer number of people released from prison every year has skyrocketed as the incarcerated population in the United States has grown from 300,000 in 1980 to more than 2.3 million today. Most are imprisoned for non-violent offences. Approximately 10 million misdemeanor cases are filed each year. Approximately 19 million people across the country have at least one felony conviction. At the same time that the sheer number of people with criminal convictions has dramatically increased, it has become much easier and more creditors to identify and ban people with criminal records because of the digitization of records and the concomitant growth of private companies that provide inexpensive background checks.

66.     The massive increase in incarceration and in the number of people with criminal convictions has had an unequal impact on the non-White community. People of color are incarcerated at rates disproportionate to their numbers in the United States general population.

67.     The fact that colored people are far more likely than Whites to have a criminal record means that colored people are much more likely than Whites to be barred from credit by automatic exclusions of people with criminal records.

68.     Race and skin color are closely-related to each other. The Equal Employment Opportunity Commission's ("EEOC") analysis of the impact of automatic criminal history bans in the employment context further confirms the disparate impact described here. The EEOC analyzed national criminal records data, concluded that automatic criminal history bans have a disparate impact on the basis of race, and documented its findings in its Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964 ("Enforcement Guidance").

69.     The EEOC's conclusion applies to the disparate impact analysis here because categorical criminal records bans operate the same way in credit as they do in employment. In both contexts, applicants are uniformly and permanently excluded, whether from credit opportunities or employment, before due consideration of the merits or qualifications of the applicant for the job or credit in question and without any individualized assessment of whether their criminal history makes them personally unqualified. They are excluded solely on the fact of a prior conviction or even a pending criminal charge, regardless of whether they pose a current risk.

## VII.    Defendant's Policy Disproportionately and Severely Impacts People of Color in Cook County, Illinois

70.     Defendant's automatic criminal history ban has a disproportionate impact based on the color of a person's skin. Specifically, Defendant's policy and practices disproportionately excludes otherwise-qualified non-White applicants.

71.     Plaintiff is a resident of Cook County, Illinois and Defendant conducts business in Cook County, Illinois.

72.     On the one hand, only 100 out of every 1000 residents of Cook County with a criminal record are White, whereas 900 out of every 1000 residents of Cook County with a criminal record are of color. On the other hand, 420 out of every 1000 resident so Cook County is White, whereas 580 out of every 1000 residents of Cook County are of color.

73.     Based on this data, people of color are 9 times more likely than Whites to have a criminal record. That is, the risk of disqualifying convictions among people of color is almost 9 times the risk of disqualifying convictions among White people.

74.     People of color seeking credit from Defendant are thus substantially more likely than Whites to be harmed by Defendant's policy and practices irrespective of the terms of credit.

75.     Defendant's refusal to provide credit to people of color on its policy and practices directly causes a racially disparate, adverse impact on people of color.

76.     Defendant's use of the non-public policy and practices means that applicants will never know the real reason why credit was denied.

77.     The statistical disparities here are extraordinary. That is, the difference in the rates at which colored applicants are adversely affected by the policy and practices is dramatically larger than the rate at which White applicants are affected. Moreover, these dramatic disparities are entirely foreseeable because of well-known disparities in the criminal justice system. As the Supreme Court has explained, large statistical disparities are "often a telltale sign of purposeful discrimination[.]" *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977).

## VIII.    Defendant's Broad Policy and Practices Cannot be Justified as Necessary for Protecting Safety, Assets, or Reputation

78.    Extensive research establishes that protecting safety, assets or reputation does not justify a blanket criminal records policy. The research shows that additional factors, such as the amount of time since the last offense, the person's age, and the type of conviction, must be considered to assess whether a past criminal conviction suggests a risk of future criminal conduct.

79.    It was in fact on that basis and the recommendation of the U.S. Probation Office, as determined by its categorization of very low risk, that this Court terminated Plaintiff's 3-year term of Supervised Release on the 1-year anniversary date from the commencement of supervision – a rare occurrence in criminal cases.

80.    The amount of time since the last offense is a critical factor in making this assessment. Studies show that in seven years or even less, the risk of future arrest for somebody with a past conviction becomes no greater than the risk for somebody without a past conviction.

81.    Studies show that a person's age and the frequency of past criminal activity are also key factors in determining whether the individual poses any risk to safety, assets, or reputation. People with a criminal record who are older, and those with fewer criminal offenses, are much less likely to engage in future criminal conduct or to pose a threat to the community.

82.    Accordingly, safety, assets, and reputation do no provide a substantial and legitimate rationale for a broad blanket ban on eligibility like Defendant's policy and practices.

**IX.** **Giving Individualized Consideration to Applicants' Circumstances Is a Readily Available and Less Discriminatory Alternative That Would Satisfy Any Substantial, Legitimate, Nondiscriminatory Interest Behind Defendant's Policy and Practices**

83.     Giving individualized consideration to each applicant's circumstances is a less discriminatory alternative to Defendant's policy and practices. This would address any substantial, legitimate, nondiscriminatory justification for the policy and practices.

84.     Specifically, to the extent safety, assets and reputational risks of Defendant are a valid justification, protection of those concerns can be accomplished through the use of individual assessments that consider the nature of an individual's conviction, the amount of time since the conviction or release, and evidence of rehabilitation, among other factors. An individualized assessment allows people with a criminal record, but who pose no realistic current or future threat to Defendant, to obtain credit. This more tailored approach both protects safety, assets, and reputation *and* is less discriminatory and exclusionary because it reduces the number of colored applicants who are categorically banned from obtaining credit from Defendant.

85.     In the analogous employment context, the EEOC recognizes that individualized assessments are almost always required by law because they provide a less discriminatory alternative to automatic criminal history bans and are sufficient to protect legitimate interests, including safety. Specifically, the EEOC's Enforcement Guidance advocates the use of "a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job." This screening should include "notice to the individual that he has been screened out because of a criminal conviction; an opportunity to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the

additional information provided by the individual warrants an exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity."

86. Defendant's overly broad policy and practices prevents any individualized consideration. But Defendant would not have to compromise any legitimate concerns that they may have to give individualized considerations to applicants' particular circumstances and allow those individuals whose credit would not threaten safety, assets, or reputational interest of Defendant.

87. Defendant's policy of automatically excluding people with felony convictions, certain misdemeanor convictions, and even some arrests, is not necessary to achieve a substantial and legitimate business interest.

## X. General RICO Allegations

88. Plaintiff is a "person" with standing to sue within the meaning of the Racketeering Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961(3) and 1964(c).

89. Defendant is a RICO "person" within the meaning of 18 U.S.C. § 1961(3) because it is an entity capable of holding a legal or beneficial interest in property.

90. Defendant, through its, employees, officers, directors, agents, representatives, and successors, acted in concert and associated as a distinct association-in-fact. Defendant therefore formed an enterprise within the meaning of 18 U.S.C. § 1961(4). Defendant does not operate as a completely separate entity in providing credit and other essential banking services under threat of violence. Rather, it has an ongoing relationship and shares the common purpose of discriminating Plaintiff and others by fraudulent means to deny credit and other essential banking services.

91.    Defendant functions as a continuing unit and has so functioned for a sufficient period of time to permit it to pursue the goals of the enterprise. Defendant has functioned as a continuing unit since at least 2008.Throughout the years, Defendant has sent denial of credit letters to those with felonies and/or other criminal histories, by the means of mail or wire, in which it claimed that its decision was based on certain credit history factors, when said claims were made falsely in order to fraudulently satisfy the Statement of Reasons requirement under 15 U.S.C. § 1691(d).

92.    Defendant sent such false denial of credit letters to innumerous applicants.

93.    Defendant sent one such letter to Plaintiff when it denied his application for the Chase Credit Card on or around February 1, 2020.

94.    Defendant sent another such letter to Plaintiff when it took the adverse action of terminating his Amazon Card on or around June 1, 2020.

95.    Defendant yet sent another such letter to Plaintiff when it denied re-opening his Amazon Card on or around June 4, 2020.

96.    Through these actions, Defendant facilitates and participates in a pattern of racketeering through predicate acts of mail and wire fraud. Defendant knows and intends that these acts of racketeering will be committed through its participation in the enterprise, and it has engaged in racketeering activities continuously over at least the previous 12 years. Defendant's racketeering practices extend over multiple years and are a regular way of conducting the ongoing business of its credit lending business.

97.    Defendant engaged in interstate commerce in that its activities and transactions relating to the false denial letters frequently required movement and communications across state

lines and the use of interstate facilities, including communication via mail, email and phone. Further, Defendant has a presence in all 50 states of the United States.

## **INJURY TO PLAINTIFF**

98.     As a result of Defendant's actions described above, Plaintiff has been directly and substantially injured. Plaintiff has been frustrated in his attempt to maintain a deposit account and obtain credit.

99.     Chase bank is everywhere. It is the largest bank in the United States. It has over 5,000 branches that covers every State in the nation. Many major companies such as Amazon.com, United Airlines, Southwest Airlines, Marriott Hotels, Disney, Starbuck, etc. have their credit cards issued through Defendant. It has essentially turned itself into Evil Corp - a trope used in the USA Network's hit television show Mr. Robot. It has become an indispensable bank in most Americans' day-to-day lives.

100.     Transitioning to a different bank will lead Plaintiff to access to fewer fee-free ATMs, different service fees, interest rates, and other such distinctive effects.

101.     The denial of credit on two different occasions led to Defendant checking Plaintiff's credit history thrice. Each check led to a drop in his credit score and appears as a credit-seeker to subsequent creditors. The termination of the Amazon Card by Defendant led to a display of short account history on his credit report. All factors in combination significantly alters his credit reports to the point that subsequent lenders will view him as a riskier applicant than he really is.

102.     Because Defendant's policy and practices have had and continue to have the effect of banning people with criminal records, who are disproportionately of color, from

obtaining credit, Defendant's conduct frustrates Plaintiff's livelihood and opportunity to obtain credit equal to his White counterparts, and free of arbitrary barriers.

103.    Plaintiff has been damaged by having to divert his assets elsewhere. Moreover, due to the COVID-19 stay-at-home orders, it is now harder than ever to locate a bank that will open a new account at a branch.

104.    Plaintiff no longer has even one credit card.

105.    On May 26, 2020, Plaintiff's business was officially approved as a federal contractor to the government of the United States and was assigned a Commercial and Government Entity Code by the Department of Defense Logistics Agency. However, after the termination of the Amazon Card, Plaintiff does not have access to any credit card anymore to do business as a federal contractor. Without the line of credit that Plaintiff was previously authorized in the Amazon Card, he will not be able to fulfill any Purchase Orders of the government as a federal contractor.

106.    But for the series of denials of the various banking services of Defendant, Plaintiff had to invest a substantial amount of time and money to relocate his assets.

107.    Defendant's discriminatory conduct, if continued, will lead Plaintiff to lose all potential business as a government contractor and the income generated thereof.

108.    Defendant's unlawful actions described herein were, and are, intentional, willful, and malicious, and/or have been, and are, implemented with callous and reckless disregard for rights protected under federal and state law.

**CAUSES OF ACTION**

**COUNT I – Disparate Impact in Violation of the ECOA, 15 U.S.C. § 1691(a)(1)**

109.     Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 108 above.

110.     Defendant's acts, policies and practices have an adverse and disproportionate impact on people of color as completed to similarly-situated Whites. This adverse and disproportionate impact is the direct result of Defendant's policy and practices, which automatically denies credit to people with a criminal record without considering the applicant's individual characteristics and circumstances.

111.     To wit, Defendant discriminated Plaintiff on the basis of color when he applied for and was denied or terminated for the Paycheck Protection Program, the Chase Credit Card, an Amazon Card, and three credit cards as an Authorized User.

112.     Defendant's policy and practices was not and is not necessary to serve any substantial, legitimate, nondiscriminatory interest, and any such interest could be satisfied by another practice – providing individualized consideration – that would have a less discriminatory effect.

113.     Defendant's acts, policies, and practices constitute discrimination and violate the ECOA and its implementing regulations, in that Defendant's acts, policies, and practices constitute a refusal to lend credit because of color, and have made obtaining credit unavailable because of color, in violation of 15 U.S.C. § 1691(a)(1).

**COUNT II – Failure to Provide a Statement of Reasons in Violation of the ECOA, 15 U.S.C. § 1691(d)(2)**

114. Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 113 above.

115. Defendant denied or terminated Plaintiff's Paycheck Protection Program loan application and three Authorized User credit cards without a statement of reasons as a matter of course to Plaintiff.

116. After the adverse actions were taken, Defendant neither provide Plaintiff with written notifications of the adverse actions that disclosed his right to a statement of reasons within 30 days after their receipt of the requests made within 60 days after such notification, nor provided the identity of the person or office from which such statement could have been obtained

117. Defendant also neither provided Plaintiff such statements orally nor gave him a written notification advising him of his right to have the statement of reasons confirmed in writing on written request.

118. Defendant's acts and omissions constitute a violation of the ECOA and its implementing regulations under of 15 U.S.C. § 1691(d)(2).

**COUNT III – Refusal to Extend Credit Based on Marital Status in Violation of the ECOA, 15 U.S.C. § 1691(a)(1)**

119. Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 118 above.

120. Defendant denied or terminated Plaintiff's three credit cards for which he was designated as an Authorized User.

121.     Plaintiff was an immediate family member of the Primary Cardholder on each credit card.

122.     Defendant not only terminated all three of Plaintiff's credit cards, its action constituted a refusal to extend credit to Plaintiff by discriminating him on the basis of marital status.

123.     Under 12 C.F.R. § 1002.7(a), Defendant is prohibited from refusing Plaintiff's individual account on the basis of marital status. The interpretive rules issued by the Consumer Financial Protection Bureau of §1002.7(a) specifically prohibit Defendant from refusing to accept Plaintiff, a non-spouse, as an Authorized User of the Primary Cardholder.

124.     Defendant's acts and omissions constitute a violation of the ECOA and its implementing rules and regulations under 15 U.S.C. § 1691(a)(1).

## COUNT IV – Pattern of Racketeering Activity under the RICO Act, in violation of 18 U.S.C. § 1962(c)

125.     Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 124 above.

126.     Defendant, through its, employees, officers, directors, agents, representatives, and successors, conducted or participated in and conspired to conduct the affairs of a RICO enterprise through a pattern of racketeering activity by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1), in violation of 18 U.S.C. § 1962(c):

a.   Mail fraud, in violation of 18 U.S.C. § 1341

b.   Wire fraud, in violation of 18 U.S.C. § 1343

127.     The predicate acts stated herein all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

128. The enterprise alleged herein also engaged in legitimate business activities beyond those necessary to carry out the alleged acts of racketeering.

129. The predicate acts described herein were related so as to establish a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c), in that the common purpose of Defendant was to defraud Plaintiff and other similarly-situated people from accessing credit.

130. Plaintiff was a victim of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

131. All of the predicate acts described herein were continuous as to form a pattern of racketeering activity in that 1) Defendant engaged in the predicate acts over a substantial time; or 2) the patterns of racketeering activity engaged in by Defendant continues or threatens to continue because such conduct has become a regular way of on-going business activities.

132. As a direct and proximate result of, and by reason of, the activities of Defendant and its conduct in violation of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property, within meaning of 18 U.S.C. § 1964(c) and is, therefore, entitled to recover threefold the damages sustained to him, with the cost of the suit, including reasonable attorneys' and experts' fees.

## I.     Mail Fraud Predicate Act

133. 18 U.S.C. § 1341. Mail Fraud. "Whoever, having devised or intending to devise any scheme or artifice to defraud,… places in any post office… to be sent by the Postal Service…" commits mail fraud.

134. Defendant's denial of credit letter for the Chase Credit Card was mailed to Plaintiff via the U.S. Postal Service on or around February 1, 2020.

135.     In order to deny Plaintiff credit, Defendant knowingly, voluntarily, and intentionally devised and participated in a scheme to defraud him by providing a false Statements of Reasons. Defendant used those false and material misrepresentations that were reasonably calculated to deceive persons of ordinary prudence and intelligence.

136.     Defendant intended for Plaintiff to rely on such false and material misrepresentations to defraud him of having access to credit. Moreover, Defendant acted with the knowledge and believe that by providing the false and material misrepresentations to Plaintiff, it would reduce its future liabilities.

## II.     Wire Fraud Predicate Acts

137.     18 U.S.C. § 1343. Wire Fraud. "Whoever, having devised or intending to devise any scheme or artifice to defraud,… transmits or causes to be transmitted by means of wire… in interstate… commerce, any writing,… for the purpose of executing such scheme…" commits wire fraud.

138.     First Wire Fraud Predicate Act: Defendant's termination of credit letter for the Amazon Card was emailed and posted on Defendant's website through logging in to his account via an online portal on or around June 1, 2020.

139.     Second Wire Fraud Predicate Act: Defendant's denial of re-opening of credit letter for the Amazon Card was emailed and posted on Defendant's website through logging in to his account via an online portal on or around June 4, 2020

140.     In order to deny Plaintiff further access to his credit, Defendant knowingly, voluntarily, and intentionally devised and participated in a scheme to defraud him by providing a false Statements of Reasons. Defendant used those false and material misrepresentations that were reasonably calculated to deceive persons of ordinary prudence and intelligence.

141.    Defendant intended for Plaintiff to rely on such false and material misrepresentations to defraud him of having access to credit. Moreover, Defendant acted with the knowledge and believe that by providing the false and material misrepresentations to Plaintiff, it would reduce its future liabilities.

### III.    Other Mail and Wire Fraud Predicate Acts

142.    Defendant has emailed, posted, and mailed via the U.S. Postal Service, such letters as aforementioned to innumerous other similarly-situated credit applicants.

143.    In order to deny those applicants access to credit, Defendant knowingly, voluntarily, and intentionally devised and participated in a scheme to defraud them by providing a false Statements of Reasons. Defendant used those false and material misrepresentations that were reasonably calculated to deceive persons of ordinary prudence and intelligence.

144.    Defendant intended for such applicants to rely on those false and material misrepresentations to defraud them from having access to credit. Moreover, Defendant acted with the knowledge and believe that by providing the false and material misrepresentations to such applicants, it would reduce its future liabilities.

145.    Each letter sent to each victim of Defendant's perpetrated fraud constitutes a predicate act of mail and/or wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

### DEMAND FOR JURY TRIAL

146.    Under Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

### REQUESTED RELIEF

147.    Plaintiff respectfully asks that the Court grant him the following relief:

a. Enter a declaratory judgment finding that the foregoing actions of Defendant violate 15 U.S.C. § 1691, 18 U.S.C. §§ 1341, 1343, and 1962.

b. Enter a permanent injunction:

    i. Enjoining Defendant and its employees, agents, officers, and directors from implementing and enforcing the illegal, discriminatory conduct described herein;

    ii. Directing Defendant and its employees, agents, officers, and directors to revise its policy and practices, to reduce the adverse and disproportionate effect it causes on the basis of color and make it consistent with the Equal Credit Opportunity Act; and

    iii. Directing Defendant and its employees, agents, officers, and directors to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

c. Award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for injuries caused by the conduct of Defendant alleged herein;

d. Award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendant for its willful, malicious, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

e. Award Plaintiff his reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c)(2);

f. Award prejudgment interest to Plaintiff; and

g. Order such other relief as this Court deems just and equitable.

Dated: June 6, 2020

Respectfully submitted,

/s/ Vivek Shah

Vivek Shah
236 Woburn Ln
Schaumburg, Il 60173

## **VERIFICATION OF COMPLAINT**

I, Vivek Shah, hereby declare under penalty of perjury that the foregoing facts contained

in this Complaint are true and correct to the best of my knowledge.

Executed on June 6, 2020

/s/ Vivek Shah
VIVEK SHAH

Exhibit

A



**CHASE**

Cardmember Services
P.O. Box 15298
Wilmington, DE 19850-5298

**Questions?**

📞 1-800-290-1316

🖥 www.chase.com/amazon

18814 RCS 001 000 15320 - NNNNNNNNNNNN CSO116
**Vivek Shah**
236 Woburn Ln
Schaumburg IL 60173-2136

June 01, 2020

# Update:
### We closed your account and we want to explain why

Your account ending in 1400

Dear Vivek Shah:

Based on a recent review of your account and credit information, we decided to close your credit account above.

**Here are the reasons we closed your account**
- RAPID INCREASE IN REVOLVING BALANCES
- TOO MANY REQUESTS FOR CREDIT OR REVIEWS OF CREDIT

**Here's where we got our information**
Our decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons for our decision.

Experian
(888) 397-3742
P.O. Box 2002
Allen, TX 75013

Details about your right to know the information in your credit report are provided at the end of this letter.

**These are your next steps**
- Destroy all cards and access checks.
- Contact any merchants that automatically bill the account for ongoing services and make other payment arrangements.
- Make payments on any remaining balance by the due date on your statements.
- Review the current terms and conditions that still apply to this account.
- Tell anyone else that uses the account that it's closed.

**If your account earns rewards, check your rewards activity**
- If you redeem rewards through Chase, you have at least 30 days to use them or you'll lose them.
- If you redeem rewards through a partner loyalty program, we'll transfer them to the partner.
- Before your rewards are used or transferred, you can lose them for program misuse, fraudulent activities, failure to pay, bankruptcy, or other reasons described in the terms of your rewards program.
- See the terms of your rewards program for details.

**Please see the end of this letter for important information.**

If you have questions, please call us at 1-800-290-1316. We're here Monday through Friday from 9 a.m. to 7 p.m. Eastern Time. We accept operator relay calls.

Sincerely,

Chase Card Services

**FAIR CREDIT REPORTING ACT NOTICE**
Under the Fair Credit Reporting Act, you also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

**EQUAL CREDIT OPPORTUNITY ACT NOTICE**
The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is the Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, DC 20006.



**CHASE** ⬡

Cardmember Services
P.O. Box 15298
Wilmington, DE 19850-5298

32459 RCS 001 000 15620 - NNNNNNNNNNNN CLO058
**Vivek Shah**
236 Woburn Ln
Schaumburg IL 60173-2136

June 04, 2020

# Update:  We didn't reopen your credit card account

Your account ending in 1400

Dear Vivek Shah:

Thank you for asking us to reopen your credit card account above. We reviewed your credit information and decided not to reopen it because:
RAPID INCREASE IN REVOLVING BALANCES
TOO MANY REQUESTS FOR CREDIT OR REVIEWS OF CREDIT

**Here's where we got our information**
Our decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons for our decision.

Experian
P.O. Box 2002
Allen, TX 75013

(888) 397-3742

Details about your right to know the information in your credit report are provided at the end of this letter.

If you owe a balance on the account:
* We will continue to send you monthly statements.
* You then must pay either the minimum monthly payment or the full balance.
* We still apply all terms and conditions of the account.

If you have questions, please call us at 1-800-290-1316. We're here Monday through Friday from 9 a.m. to 7 p.m. Eastern Time.

Sincerely,

Chase Card Services

**See the end of this letter for important information**

**FAIR CREDIT REPORTING ACT NOTICE**

Under the Fair Credit Reporting Act, you also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

**EQUAL CREDIT OPPORTUNITY ACT NOTICE**

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is the Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, DC 20006.

Deposit Mail Services
PO Box 182051
Columbus, Ohio 43218

**CHASE** 

Questions?
1-877-382-8854
1-614-436-4636; outside the U.S.

VIVEK M SHAH
7190 W SUNSET BLVD STE 1411
LOS ANGELES, CA 90046-4415

April 21, 2020

Important Information: **We have decided to close your account**

Dear VIVEK M SHAH:

After a recent review of your account, we have decided to end our relationship with you.

### Here's what you need to know and do

We enclosed important account closing information outlining the steps you may need to take.

You've received this letter as an account owner and should share this information with others listed on the account. Even though we are closing your banking and/or investment accounts, any Chase Auto, Mortgage and/or Student loan or lease accounts you may have with us will remain open. Please continue to make regular payments.

You may receive additional account closing notifications if you have other accounts under a different name or address.

If you have any questions, call us Monday through Sunday from 7 a.m. to 12 a.m. Eastern Time at 1-877-382-8854. If you're outside the United States, call us collect at 1-614-436-4636.

Sincerely,

Chase Customer Service

Enclosed:

Deposit Account Closure Information

VIVEK M SHAH
7190 W SUNSET BLVD STE 1411
LOS ANGELES, CA 90046-4415 USA



### Deposit Account Closure Information

## We will close the following account on June 19, 2020 and decline any transactions

**Account (last 4 digits)**

0326

## Here's what we recommend you do by June 19, 2020

- Cancel all automated deposits and withdrawals on your account.
- Open a new account at another institution.
- Transfer your account balance by writing a check from your Chase account or initiating an online wire transfer using chase.com.
- Redeem any eligible Ultimate Rewards points linked to your account.
  - Travel or cash back rewards must be redeemed before your account is closed.
  - Other rewards can be redeemed for 30 days after the account is closed by visiting a Chase branch or by calling one of the telephone numbers listed on the cover letter.

We will mail you a check for any remaining funds within 10 business days after we close the account and verify all deposits and payments.

LTR-115EXDDA
JP Morgan Chase Bank, N A





Your Next 3 Bureau Credit Report and **FICO® Scores** will be available in **340 days**. Can't wait?

> ### Refresh Now
> ### (/member/upgrade/b4c
> ### pcm=false)

# Credit Alerts

| | |
|---|---|
| **All** | **(/member/credit/alerts/all)** |
| Read | (/member/credit/alerts/read) |
| Unread | (/member/credit/alerts/unread) |
| Deleted | (/member/credit/alerts/deleted) |

Actions   ⌄      All Alerts Types   ⌄

☐ **Select All**

☐   Credit Rating Decrease        Jun 5, 2020

### Your Credit Rating Decreased



Good
670 - 739

## 728 ↓21 pts

FICO SCORE 8 **Learn more**
Experian data Jun 5, 2020.

300                                         850

---

## What now?

A Score Rating decrease does not have to be lasting. Begin by taking
action to bring your score rating back up by using Experian Boost.

**Boost for free** › (/member/credit/boost/home)

---

**Delete**

**Mark as unread**

---

☐ ## Credit Score Decrease                                    Jun 5, 2020
Your FICO® Score has decreased by 21 points.

---

☐ ## Credit Line Closed by Grantor                            Jun 4, 2020
JPMCB CARD has flagged your account as Credit Line Closed by Grantor.

---

☐ ## Credit Score Increase                                    Jun 2, 2020
Your FICO® Score has increased by 5 points.

---

☐ ## Your Andigo Credit Union account needs attention         May 16, 2020
Please reconnect your Andigo Credit Union.

---

☐ ## Credit Rating Increase                                   May 12, 2020
Your FICO® Score rating has changed from Good to Very Good!

---

☐ ## Credit Score Increase                                    May 12, 2020
Your FICO® Score has increased by 18 points.



☐ **Credit Score Increase**
Your FICO® Score has increased by 1 points.
May 9, 2020

☐ **Business Loan Inquiry**
US SM BUS ADMIN ODA obtained a copy of your Experian Credit Report.
Apr 26, 2020

☐ **New Bank/Credit Card**
JPMCB CARD reported a new account on your Experian Credit Report.
Apr 22, 2020

<   1   2   3   4   5   >

Showing **1 - 10** of **139**

## Matched for you, not us

Recommendations based on your excellent credit profile, so you get what you need from your card.

**See my matches**



The offers that appear on this site are from third party companies ("our partners") from which Experian Consumer Services receives compensation, however the compensation does not impact how or where the products appear on this site. The offers on the site do not represent all available financial services, companies, or products.

Services   —

     Overview

     Reports & Scores

     Personal Finances   <sup>BETA</sup>

     Protection

# CHASE 

 
## June 2020

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 31 | 1 | 2 | 3 | 4 | **5** | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |

New Balance
**$1,040.10**

Minimum Payment Due
**$35.00**

Payment Due Date
**06/05/20**

### POINTS SUMMARY

| | |
|---|---|
| Previous points balance | 0 |
| + 5% Back on Amazon.com purchases | 2,302 |
| + 5% Back on Whole Foods Market purchases | 0 |
| + 2% Back at gas stations | 0 |
| + 2% Back at restaurants | 65 |
| + 2% Back at drugstores | 0 |
| + 1% Back on all other purchases | 548 |

**Total points available for redemption    2,915**

"% Back rewards" are the rewards you earn under the program. % Back rewards are tracked as points and each $1 in % Back rewards earned is equal to 100 pts. You can redeem your points toward millions of items when you shop at Amazon.com or for cash back, gift cards and travel at chase.com/amazonrewards.

To see if your card earns 5% Back or 3% Back on Amazon.com and Whole Foods Market purchases, sign into an Amazon.com account where your card is loaded, visit "Your Account" page, click the "Manage Payment Options" page under the "Payment Methods" section, and expand the details of your credit card. If that Amazon.com account has an eligible Prime membership, and your card could be earning 5% Back on Amazon.com and Whole Foods Market purchases, you'll see how to start earning 5% Back on Amazon.com and Whole Foods Market purchases. You can go to Chase.com to see whether you earned 5% Back or 3% Back on previous Amazon.com and Whole Foods Market purchases.

Have a question about what you ordered at Amazon.com? Sign in to your Amazon.com account and go to "Your Account," then "Your Orders" to view your recent orders. For questions about purchases or returns, call Amazon Customer Service at 1-866-216-1072.

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $39.00.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 3 years | $1,427 |
| $38 | 3 years | $1,380 (Savings=$47) |

If you would like information about credit counseling services, call 1-866-797-2885.

### ACCOUNT SUMMARY

| | |
|---|---|
| **Account Number:** ⬛⬛⬛ 1400 | |
| Previous Balance | $0.00 |
| Payment, Credits | -$9.89 |
| Purchases | +$1,049.99 |
| Cash Advances | $0.00 |
| Balance Transfers | $0.00 |
| Fees Charged | $0.00 |
| Interest Charged | $0.00 |
| **New Balance** | **$1,040.10** |
| Opening/Closing Date | 04/22/20 - 05/08/20 |
| Credit Access Line | $6,400 |
| Available Credit | $5,359 |
| Cash Access Line | $1,280 |
| Available for Cash | $1,280 |
| **Past Due Amount** | **$0.00** |
| **Balance over the Credit Access Line** | **$0.00** |

## YOUR ACCOUNT MESSAGES

If you experience COVID-19 related mail delivery disruptions, remember you can always access your statements on chase.com or the Chase Mobile App.


prime

P.O. BOX 15123
WILMINGTON, DE 19850-5123
For Undeliverable Mail Only

**AUTOPAY IS ON**
See Your Account
Messages for details.

4147400278981400003500010401000000007

| Payment Due Date: | 06/05/20 |
|---|---|
| New Balance: | $1,040.10 |
| Minimum Payment: | $35.00 |

Account number: ⬛⬛⬛ 1400

$_____._____ Amount Enclosed
**AUTOPAY IS ON**

81683 BEX 9 12920 C

VIVEK SHAH
236 WOBURN LN
SCHAUMBURG IL 60173-2136

CARDMEMBER SERVICE
PO BOX 1423
CHARLOTTE NC  28201-1423

5000160 28  3740 2789814005

## To contact us regarding your account:



**Call Customer Service:**
In U.S.          1-888-247-4080
Spanish          1-888-446-3308
Pay by phone   1-800-436-7958
International    1-302-594-8200
We accept operator relay calls


**Send Inquiries to:**
P.O. Box 15298
Wilmington, DE 19850-5298


**Mail Payments to:**
P.O. Box 1423
Charlotte, NC 28201-1423


**Visit Our Website:**
www.chase.com/cardhelp

**Information About Your Account**

**Making Your Payments:** The amount of your payment should be at least your minimum payment due, payable in U.S. dollars and drawn on or payable through a U.S. financial institution or the U.S. branch of a foreign financial institution. You can pay down balances faster by paying more than the minimum payment or the total unpaid balance on your account.

You may make payments electronically through our website or by one of our customer service phone numbers above. In using any of these channels, you are authorizing us to withdraw funds as a one-time electronic funds transfer from your bank account. In our automated phone system, this authorization is provided via entry of a personal identification number. You may revoke this authorization by cancelling your payment through our website or customer service telephone numbers prior to the payment processing. If we receive your completed payment request through one of these channels by 11:59 p.m. Eastern Time, we will credit your payment as of that day. If we receive your request after 11:59 p.m. Eastern Time, we will credit your payment as of the next calendar day. If you specify a future date in your request we will credit your payment as of that day.

If you pay by regular U.S. mail to the Payments address shown on this statement, write your account number on your check or money order and include the payment coupon in the envelope. Do not send more than one payment or coupon per envelope. Do not staple, clip or tape the documents. Do not include correspondence. Do not send cash. If we receive your properly prepared payment on any day by 5 p.m. local time at our Payments address on this statement, we will credit to your account that day. If your payment is received after 5 p.m. local time at our Payments address on this statement, we will credit it to your account as of the next calendar day.

For all other payments or for any payment type above for which you do not follow our payment instructions, crediting of your payments may be delayed for up to 5 days.

**Account Information Reported To Credit Bureau:** We may report information about your Account to credit bureaus. Late payments, missed payments or other defaults on your Account may be reflected in your credit report. If you think we have reported inaccurate information to a credit bureau, please write to us at Chase Card Services P.O. Box 15369, Wilmington, DE 19850-5369.

**To Service And Manage Any Of Your Account(s):** When you give us your mobile phone number, we have your permission to contact you at that number about all your Chase or J.P. Morgan accounts. Your consent allows us to use text messaging, artificial or prerecorded voice messages and automatic dialing technology for informational and account service calls, but not for telemarketing or sales calls. It may include contact from companies working on our behalf to service your accounts. Message and data rates may apply. You may contact us anytime to change these preferences.

**Authorization To Convert Your Check To An Electronic Transfer Debit:** When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check. Your bank account may be debited as soon as the same day we receive your payment. You will not receive your check back from your institution.

**Conditional Payments:** Any payment check or other form of payment that you send us for less than the full balance due that is marked "paid in full" or contains a similar notation, or that you otherwise tender in full satisfaction of a disputed amount, must be sent to Card Services, P.O. Box 15049, Wilmington, DE 19850-5049. We reserve all our rights regarding these payments (e.g., if it is determined there is no valid dispute or if any such check is received at any other address, we may accept the check and you will still owe any remaining balance). We may refuse to accept any such payment by returning it to you, not cashing it or destroying it. All other payments that you make should be sent to the regular Payment address shown on this statement.

**Annual Renewal Notice:** If your Account Agreement has an annual membership fee, you are responsible for it every year your Account is open. We will add your annual membership fee to your monthly billing statement once a year, whether or not you use your account. Your annual membership fee will be added to your purchase balance and may incur interest. The annual membership fee is non-refundable unless you notify us that you wish to close your account within 30 days or one billing cycle (whichever is less) after we provide the statement on which the annual membership fee is billed. Your payment of the annual membership fee does not affect our rights to close your Account and to limit your right to make transactions on your Account. If your Account is closed by you or us, the annual membership fee will no longer be billed to your Account.

**Calculation Of Balance Subject To Interest Rate:** To figure your periodic interest charges for each billing cycle when a daily periodic rate(s) applies, we use the daily balance method (including new transactions). To figure your periodic interest charges for each billing cycle when a monthly periodic rate(s) applies, we use the average daily balance method (including new transactions). For an explanation of either method, or questions about a particular interest charge calculation on your statement, please call us at the toll free customer service phone number listed above.

We calculate periodic interest charges separately for each feature (for example, purchases, balance transfers, cash advances or overdraft advances). These calculations may combine different categories with the same periodic rates. Variable rates will vary with the market based on the Prime Rate or such index described in your Account Agreement. There is a transaction fee for each balance transfer, cash advance, or check transaction in the amount stated in your Account Agreement. There is a foreign transaction fee of 3% of the U.S. dollar amount of any foreign transaction for some accounts. Please see your Account Agreement for information about these fees.

We add transactions and fees to your daily balance no earlier than:

1. the date of the transaction – for new purchases, balance transfers, overdraft advances, cash advances, or My Chase Loans;

2. the date the payee deposits the check – for new cash advance checks or balance transfer checks;

3. the date of a related transaction, the date they are posted to your account, or the last day of the billing cycle, whichever we may choose – for fees

**How To Avoid Paying Interest On Purchases:** Your due date will be a minimum of 21 days after the close of each billing cycle. If you pay your account (or Interest Saving Balance) in full each billing period by the date and time due, no interest is charged on new purchases month to month. Also, we will not impose interest charges on any portion of a purchase balance you repay while that balance is subject to an interest-free period. Subject to any interest-free period for new purchases, we will begin charging interest from the date a transaction (including any balance transfer, cash advance or overdraft advance), fee or interest charge is added to your daily balance until your account is paid in full. Because we apply payments in excess of your minimum payment first to higher rate balances, you may not be able to avoid interest charges on new purchases if you have another balance at a higher interest rate unless you pay your balance (or Interest Saving Balance) in full each month.

**Credit Limit:** If you want to inquire about your options to help prevent your account from exceeding your credit limit, please call the number on the back of your card.

**What To Do If You Think You Find A Mistake On Your Statement:** If you think there is an error on your statement, write to us on a separate sheet at Customer Service, P.O. Box 15299, Wilmington, DE 19850-5299.

In your letter, give us the following information:

- Account information: Your name and Account number.

- Dollar amount: The dollar amount of the suspected error.

- Description of Problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors in writing. You may call us or notify us electronically, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.

- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.

- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.

- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases:** If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)

2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card Account do not qualify.

3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing at Customer Service, P.O. Box 15299, Wilmington, DE 19850-5299.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay we may report you as delinquent.

MA04252019



To manage your account, including card payments, alerts, and change of address, visit **Chase.com/cardhelp** or call the customer service number which appears on your account statement.



**CHASE** 

| Manage your account online: | Customer Service: | Mobile: Download the |
| www.chase.com/amazon | 1-888-247-4080 | Chase Mobile® app today |



## YOUR ACCOUNT MESSAGES  (CONTINUED)

Your next AutoPay payment for $1,040.10 will be deducted from your Pay From account and credited on your due date.  If your due date falls on a Saturday, we'll credit your payment the Friday before.

Your AutoPay amount will be reduced by any payments or merchant credits that post to your account before we process your  AutoPay payment.  If the total of these payments and merchant credits is more than your set  AutoPay amount, your AutoPay payment for that month will be zero.

## ACCOUNT ACTIVITY

| Date of Transaction | Merchant  Name or Transaction Description | $ Amount |
|---|---|---|
| **PAYMENTS AND OTHER CREDITS** | | |
| 05/04 | GROUPON-CUISINE OF INDI Chicago CA | -9.89 |
| **PURCHASE** | | |
| 04/28 | WFM Amazon*AH4288863 Amzn.com/bill WA<br>Order Number      114-1224438-7913069 | 42.08 |
| 04/30 | BLUE SHIELD CALIFORNIA 800-393-6130 CA | 208.02 |
| 04/30 | PUSH HEALTH 8557874432 CA | 245.79 |
| 05/02 | AMZN Mktp US*MM3QS6JW3 Amzn.com/bill WA<br>Order Number      113-7256232-6597813 | 229.84 |
| 05/02 | AMZN Mktp US*IW88T6SH3 Amzn.com/bill WA<br>Order Number      113-8891053-9333810 | 3.02 |
| 05/02 | CUISINE OF INDIA MP LLC MOUNT PROSPEC IL | 19.78 |
| 05/01 | GRUBHUBCAFEZUPASSCHAU GRUBHUB.COM NY | 12.30 |
| 05/03 | AMZN Mktp US*788ZG0QZ3 Amzn.com/bill WA<br>Order Number      112-7888930-4057009 | 20.19 |
| 05/04 | TARGET       00008805 SCHAUMBURG IL | 34.23 |
| 05/04 | RAISE.COM HTTPSRAISE.CO IL | 34.98 |
| 05/04 | AMZN Mktp US*4G9JQ9GY3 Amzn.com/bill WA<br>Order Number      113-9564732-4334653 | 55.12 |
| 05/04 | Amazon Prime*IR1BL31L3 Amzn.com/bill WA<br>Order Number      D01-2718299-2649860 | 5.99 |
| 05/06 | CARDCASH 800-227-4214 NJ | 20.46 |
| 05/06 | AMZN Mktp US*T26JS3K63 Amzn.com/bill WA<br>Order Number      114-8085119-7644240 | 104.01 |
| 05/07 | RAISE.COM HTTPSRAISE.CO IL | 14.18 |

| **2020  Totals Year-to-Date** | |
|---|---|
| Total fees charged in 2020 | $0.00 |
| Total interest charged in 2020 | $0.00 |

Year-to-date totals do not reflect any fee or interest refunds you may have received.

## INTEREST CHARGES

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Balance Type | Annual Percentage Rate (APR) | Balance Subject To Interest Rate | Interest Charges |
|---|---|---|---|
| **PURCHASES** | | | |
| Purchases | 19.24%(v)(d) | - 0 - | - 0 - |
| **CASH ADVANCES** | | | |
| Cash Advances | 24.99%(v)(d) | - 0 - | - 0 - |
| **BALANCE TRANSFERS** | | | |
| Balance Transfer | 19.24%(v)(d) | - 0 - | - 0 - |
| | | | **16 Days in Billing Period** |

(v) = Variable Rate
(d) = Daily Balance Method (including new transactions)
(a) = Average Daily Balance Method (including new transactions)

Please see Information About Your Account section for the Calculation of Balance Subject to Interest Rate, Annual Renewal Notice, How to Avoid Interest on Purchases, and other important information, as applicable.



# CHASE *for* BUSINESS

Printed from Chase for Business

---

## CREDIT CARD  (...1400)

| | | |
|---|---|---|
| Current balance | Available credit | Amazon Prime Rewards |
| **−$85.81** | **$0.00** | |
| Minimum payment due | Remaining statement balance | |
| $0.00 | $0.00 | |

Automatic payment is **On**.

## Account activity

SHOWING　　　Activity since last statement

Current balance  **−$85.81**

| Date | Description | Category | Amount |
|---|---|---|---|
| Jun 3, 2020 | AMZN Mktp US | Shopping | −$350.61 |
| Jun 2, 2020 | AMZN Mktp US | Shopping | −$229.84 |
| May 31, 2020 | WENDY'S 7003 | Food & drink | $2.23 |
| May 31, 2020 | AMZN Mktp US*MY1HC2NX1 | Shopping | $34.08 |
| May 31, 2020 | Amazon.com*MY8HY9ZZ1 | Groceries | $35.88 |
| May 30, 2020 | Upwork -304745299REF | Professional services | $360.50 |
| May 29, 2020 | BOSTON MARKET 0260 | Food & drink | $13.31 |
| May 29, 2020 | TRADER JOE'S #705 QPS | Groceries | $14.28 |
| May 28, 2020 | CAFE ZUPAS ONLINE ORDER | Food & drink | −$800.00 |
| May 28, 2020 | CAFE ZUPAS ONLINE ORDER | Food & drink | $800.00 |
| May 28, 2020 | MISTER MAIL | Personal | $20.42 |
| May 27, 2020 | Payment Thank You - Web | — | −$543.73 |
| May 26, 2020 | Amazon.com*M77QR7QK0 | Shopping | $12.94 |
| May 25, 2020 | WALMART.COM | Shopping | $25.24 |

| Date | Description | Category | Amount |
|------|-------------|----------|-------:|
| May 25, 2020 | Upwork -304127617REF | Professional services | $103.00 |
| May 25, 2020 | AMZN Mktp US*M75BO0KF1 | Shopping | $10.58 |
| May 24, 2020 | GROUPON INC | Personal | $4.25 |
| May 24, 2020 | AMZN Mktp US*M72JB8082 | Shopping | $22.56 |
| May 24, 2020 | Amazon.com*M72KS51R2 | Shopping | $7.42 |
| May 24, 2020 | GROUPON INC | Personal | $3.07 |
| May 24, 2020 | TARGET 00008805 | Shopping | $44.36 |
| May 24, 2020 | AMZN Mktp US*M73PP7D31 | Shopping | $23.64 |
| May 23, 2020 | WWW.1AND1.COM | Bills & utilities | $1.00 |
| May 23, 2020 | Amazon.com*M72RR3EB2 | Shopping | $28.97 |
| May 23, 2020 | Amazon.com*M71009841 | Shopping | $23.31 |
| May 22, 2020 | BACK IN LINE CHIROPRACTIC | Health & wellness | $93.71 |
| May 21, 2020 | Payment Thank You - Web | — | −$773.12 |
| May 21, 2020 | WALGREENS #9506 | Health & wellness | $3.58 |
| May 20, 2020 | AMZN Mktp US*M77JJ1E31 | Shopping | $53.31 |
| May 20, 2020 | TRADER JOE'S #705 QPS | Groceries | $46.23 |
| May 20, 2020 | AMZN Mktp US*M75NK0T90 | Shopping | $50.50 |
| May 20, 2020 | INTUIT *TURBOTAX | Shopping | $50.00 |
| May 19, 2020 | AMZN Mktp US*M793U2CI2 | Shopping | $21.24 |
| May 19, 2020 | AMZN Mktp US*M76LK9TB1 | Shopping | $350.61 |
| May 19, 2020 | GROUPON-GREEN BASIL THA | Personal | −$0.71 |
| May 19, 2020 | Amazon.com*M72AW2JB1 | Shopping | $7.79 |
| May 18, 2020 | TULSI GROCERS | Groceries | $12.11 |
| May 18, 2020 | AMZN Mktp US*M720Y7LP1 | Shopping | $17.51 |

| Date | Description | Category | Amount |
|------|-------------|----------|--------|
| May 18, 2020 | AMZN Mktp US*M786523G1 | Shopping | $42.39 |
| May 18, 2020 | AMZN Mktp US*M70HC9L21 | Shopping | $7.43 |
| May 17, 2020 | AMZN Mktp US*MC9GB0992 | Shopping | $25.49 |
| May 17, 2020 | Amazon.com*M72U60FD0 | Shopping | $14.72 |
| May 17, 2020 | Amazon.com*MC5UH6UF2 | Shopping | $24.62 |
| May 17, 2020 | Amazon.com*M76UU8FK0 | Shopping | $27.26 |
| May 17, 2020 | Payment Thank You - Web | — | −$546.41 |
| May 16, 2020 | TARGET 00008805 | Shopping | $45.42 |
| May 16, 2020 | AMZN Mktp US*MC6FK9YT1 | Shopping | $20.96 |
| May 16, 2020 | Amazon.com*M75HV8CE1 | Shopping | $10.87 |
| May 16, 2020 | AMZN Mktp US*M73Z81CG1 | Shopping | $25.86 |
| May 16, 2020 | Amazon.com*M74Z83CO1 | Shopping | $13.62 |
| May 15, 2020 | AMZN Mktp US*MC8645SG2 | Shopping | $18.80 |
| May 15, 2020 | AMZN Mktp US*MC1SY1RD0 | Shopping | $2.61 |
| May 15, 2020 | AMZN Mktp US*MC7665SU2 | Shopping | $20.17 |
| May 14, 2020 | GREEN BASIL THAI | Food & drink | $14.35 |
| May 14, 2020 | SUSHI THAI II | Food & drink | $4.30 |
| May 14, 2020 | TARGET 00008334 | Groceries | $5.67 |
| May 14, 2020 | GROUPON-TBK GRILL | Personal | −$10.00 |
| May 13, 2020 | AMZN Mktp US*MC79E92I1 | Shopping | $16.11 |
| May 13, 2020 | STAPLES DIRECT | Shopping | $4.25 |
| May 12, 2020 | US REEBOK ONLINE STORE | Shopping | $16.39 |
| May 11, 2020 | RAISE.COM | Shopping | $22.76 |
| May 11, 2020 | Amazon.com*ZV1VC0SK3 | Shopping | $20.59 |

| Date | Description | Category | Amount |
|------|-------------|----------|--------|
| May 11, 2020 | HEALTH CARE SERVICES COM | Bills & utilities | $399.04 |
| May 11, 2020 | AMZN Mktp US*MC4U61QH1 | Shopping | $44.89 |
| May 11, 2020 | Payment Thank You-Mobile | — | −$1,809.54 |
| May 10, 2020 | 2975 Dominos Pizza | Food & drink | $8.95 |
| May 10, 2020 | TBK GRILL | Food & drink | $13.46 |
| May 9, 2020 | Amazon.com*DC8MR5QL3 | Shopping | $25.51 |
| May 9, 2020 | AMZN Mktp US*2H1316903 | Shopping | $18.36 |
| May 8, 2020 | BIG BOWL SCHAUMBURG | Food & drink | $10.75 |
| May 8, 2020 | RAISE.COM | Shopping | $50.00 |
| May 8, 2020 | Amazon.com*HF01G67P3 | Groceries | $50.93 |
| May 8, 2020 | SAG-AFTRA | Personal | $578.56 |
| May 8, 2020 | JEWEL-OSCO | Groceries | $31.06 |
| May 8, 2020 | RITUAL.CO* RITUAL-YUS | Food & drink | $1.59 |
| May 7, 2020 | BUFFALO WILD WINGS 0342 | Food & drink | $2.68 |

JPMorgan Chase Bank, N.A. Member FDIC      ©2020 JPMorgan Chase & Co.      Equal Opportunity Lender ⌂

 experian.                                                    

Jun 6, 2020 - Report + FICO® Score + added versions                                        ⌄

| Experian® | Equifax® | TransUnion® |
|---|---|---|

Your Next 3 Bureau Credit Report and **FICO® Scores** will be available in **340 days**. Can't wait?

**Refresh Now**
**(/member/upgrade/b4...**
**pcm=false)**

| FICO® Score 8 | Additional FICO® Scores |
|---|---|

**Score Tracker**                                                                                ⌄





Credit score is calculated based on FICO® Score 8 model, unless otherwise noted. In addition to the FICO® Score 8, we may offer and provide other base or industry-specific FICO® Scores (such as FICO® Auto Scores and FICO® Bankcard Scores). Your lender or insurer may use a different FICO® Score than FICO® Score 8 or such other base or industry-specific FICO® Score (if available), or another type of credit score altogether. Learn more.

Based on your credit profile, you may qualify for this offer from our partner:



**Delta SkyMiles® Gold American Express Card**