**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

VIVEK SHAH,
     Plaintiff,

v.
                                 Civil Action No . <u>1:20-cv-03355</u>

JPMORGAN CHASE BANK, N.A.,
and JOHN DOES 1-5,                  Honorable Gary S. Feinerman
     Defendants.                  Magistrate Judge: Honorable Young B. Kim

**<u>FIRST AMENDED COMPLAINT</u>**

**FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES**

***JURY DEMANDED***

**<u>PRELIMINARY STATEMENT</u>**

1.     J.P. Morgan Chase, N.A. ("Chase") is a convicted felon. So is Plaintiff Vivek Shah. Yet, Chase categorically discriminates felons from opening and maintaining any of its checking or credit accounts. It maintains and enforces policies of automatically excluding any person with a record of a felony conviction from accessing its checking and credit products. Plaintiff, proceeding *pro se*, brings this suit against Defendants under the civil remedies provided in the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 et seq., the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 et seq., Regulation B promulgated thereunder, 12 C.F.R. § 1002,  and the Illinois Consumer Fraud and Deceptive Business Practices Act to (1) prevent each Defendant from continuing its discriminatory and unlawful conduct against Plaintiff and those similarly situated, and to ensure that Plaintiff and others injured by the anti-felon policies – who are disproportionately of color – will have a

1

meaningful opportunity to have access to essential banking services, and (2) redress the harm Plaintiff has suffered as a direct result of Defendants' conduct.

2.     The anti-felon policies and practice's disproportionate, adverse impact on people of color violates the ECOA. There is a readily available and less discriminatory alternative to an automatic blanket ban on felonies for dealing with any potential concerns about applicants with a criminal record. Instead of automatically excluding every applicant within the scope of its policies, Defendants can and are legally required to individually assess potential applicants with a felony by considering factors directly relevant to the prospective applicant's credit history. Individualized assessments would permit Chase to carefully review the credit history of applicants that would also permit prospective applicants who have a criminal record, but who pose no threat to the bank to obtain credit.

3.     Chase's decision to maintain a far-reaching blanket ban, despite various industries' rejection of such bans due to their discriminatory impact, indicates that these policies and practices not only have an unlawful disparate impact, but were motivated by an intent to block people who are of color from obtaining credit.

4.     Chase's discriminatory policies and practices directly prevent individuals like Plaintiff who are reentering society after time in prison from securing any tangible thing of value, whether it is housing, medical supplies, or clothing, that is crucial to their successful reintegration. Chase's policies and practices also impacts individuals with a prior conviction long after an individual has successfully reentered the community.

2

**NATURE OF THE ACTION**

5.     Plaintiff seeks injunctive, monetary, and declaratory relief against Defendants for engaging in a practice of illegal discrimination on the basis of color at the banks that Chase owns and operates.

6.     An applicant who has a criminal history within the scope of Chase's policies is automatically barred regardless of the nature of the conviction, the amount of time that has lapsed since the conviction, evidence of rehabilitation, prior credit or banking history, or any other factor related to whether the person poses a threat to Chase's business. As a result, an elderly person with a decades-old drug conviction is treated identically to a person with a very recent violent conviction: both are barred without further review.

7.     As a direct result, applicants with a felony are either (1) deterred from ever applying to Chase's credit products since it would lower their credit score with the credit bureaus; or (2) automatically denied because of the anti-felon policies.

8.     Analysis of criminal records and other data shows that the Chase's policies, though facially neutral, have a severe disparate impact on the basis of color. The population of the United States has been estimated to be 328 million.[1] Today, Whites make up around 76% and people of color make up around 24% of the U.S. population.[2] Yet, people of color account for approximately 41% of all convicted felons in the U.S.[3] The Bureau of Justice Statistics provides an even higher disparity among sentenced prisoners – an alarming 72% of prisoners are non-White.[4]

---

[1] https://www.census.gov/quickfacts/fact/table/US/PST045219
[2] *Id.*
[3] https://www.ncsc.org/__data/assets/pdf_file/0029/15878/jury-of-ones-peers.pdf
[4] https://www.bjs.gov/nps/resources/documents/QT_age%20sex%20race%20distribution_counts_2016.xlsx

9.     About 70 million Americans have a criminal record.[5] And as a ballpark estimate, over 20 million Americans currently have a felony conviction in their past.[6]

10.     At least 1.5 million Illinoisans have a felony record.[7]

11.     The State of Illinois has an estimated population of 12.6 million people, consisting of approximately 77% Whites and 23% people of color.[8]

12.     Cook County, Illinois has an estimated population of 5.2 million people, consisting of approximately 65% Whites and 35% people of color.[9]

13.     90% of Chase's Board of Directors are White.[10] 100% of Chase's Operating Committee is White.[11]

14.     The Equal Credit Opportunity Act prohibits the application of any policy or practice that has a disparate impact unless it is necessary to achieve a substantial, legitimate, nondiscriminatory business interest that cannot be satisfied by an alternative that has a less discriminatory effect.

15.     ECOA specifically makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction on the basis of … color[.]" 15 U.S.C. § 1691(a).

16.     Chase's policies and practice is not necessary to achieve a substantial, legitimate, nondiscriminatory business interest. A less discriminatory alternative for dealing with any potential concerns raised by applicants with criminal records is available to Chase.

---

[5] https://obamawhitehouse.archives.gov/issues/criminal-justice/fair-chance-pledge
[6] https://www.jec.senate.gov/public/_cache/files/b23fea23-8e98-4bcd-aeed-edcc061a4bc0/testimony-eberstadt-final.pdf
[7] https://icjia.illinois.gov/researchhub/articles/the-impact-of-employment-restriction-laws-on-illinois-convicted-felons
[8] https://www.census.gov/quickfacts/IL
[9] https://www.census.gov/quickfacts/fact/table/cookcountyillinois/PST120219
[10] https://institute.jpmorganchase.com/about/our-leadership
[11] *Id.*

17.     Instead of automatically excluding every applicant covered by their far-reaching policies and practices, Chase should individually assess an applicant with a criminal history by considering factors directly relevant to the applicant's qualifications for credit such as the nature of the conviction or conduct, when it occurred, their age at the time the conduct occurred, their post-conviction and post-release conduct, evidence of their rehabilitation, evidence of whether their credit approval would create a direct threat to Chase's business, their credit history, and other relevant factors. When considered in their totality, such an individualized assessment enables a creditor to make a reasoned decision about a particular applicant's suitability for credit approval.

18.     The more tailored approach required by an individual assessment protects financial and business interests of Chase, yet it is less discriminatory and exclusionary because it reduces the number of people of color who are categorically barred from being extended credit.

19.     Plaintiff brings this action to address Defendants' discriminatory and unlawful conduct and to redress the harm he has suffered and will continue to suffer as a direct result of that conduct, absent relief.

**PARTIES**

20.     Plaintiff Vivek Shah is a natural-born U.S. citizen. He is a non-White male; a person of color. In August 2012 he was arrested by the FBI for Mailing Threatening Communications. He was sentenced in the Southern District of West Virginia to 87 months in prison. On February 4, 2019 he was released from prison, and on February 4, 2020 his supervision was terminated by Honorable Jorge L. Alonso of this Court. His principal place of residence is 236 Woburn Ln, Schaumburg, IL 60173.

21. Chase JPMorgan Chase, N.A. is an American multinational investment bank and financial services holding company headquartered in New York, NY. JPMorgan Chase is ranked by S&P Global as the largest bank in the United States and the sixth largest bank in the world by total assets of US$2.687 trillion.

22. Chase is a federally chartered bank with its principal place of business at 200 White Clay Center Drive, Newark, Delaware 19711.

23. The identities of "John Does" 1-5 are not currently known to Plaintiff, but upon information and believe, they are employees of Chase. Plaintiff will identify these John Does upon further knowledge and investigation and will amend his pleadings accordingly.

24. In acting or omitting to act as alleged herein, Chase was acting through its employees and/or agents and is liable on the basis of the acts and omissions of its employees and/or agents.

25. In acting or omitting to act as alleged herein, each employee, officer or agent of Chase was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Chase as principal.

## JURISDICTION AND VENUE

26. This Court has jurisdiction over this matter under 15 U.S.C. § 1691e, 18 U.S.C. § 1964, and 28 U.S.C. § 1343.

27. This Court has supplemental jurisdiction over the state laws claim in this action under 28 U.S.C. § 1367(a) because it is also related to the federal claims asserted against Chase so that it forms part of the same case or controversy under Article III of the U.S. Constitution. The Court furthermore has jurisdiction over the state law claim in this action under 28 U.S.C. §

1332(a)(1) because the amount in controversy exceeds $75,000, and is between citizens of different States.

28.     This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Fed. Rules of Civ. P.

29.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Chase is a national bank that is chartered and supervised by the Office of the Comptroller of the Currency, an agency in the U.S. Treasury Department, pursuant to the National Bank Act. Chase has bank branches throughout the Northern District of Illinois where Plaintiff has transacted with Chase. Plaintiff is a resident of Schaumburg, IL. A substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### I.     Chase's Conduct Leading to the Instant Suit

30.     In or around the year 2004, Plaintiff opened a Checking Account ("First Account") at a Washington Mutual bank in Schaumburg, IL. In or around 2008, Chase bank purchased and rebranded Washington Mutual to Chase. Plaintiff's First Account was therefore converted to a Chase checking account.

31.     In or around the year 2010, Plaintiff applied for and was approved for a Chase Sapphire Preferred Credit Card ("Sapphire Card").

32.     On August 10, 2012, Plaintiff was arrested by the FBI for Mailing Threatening Communications. None of Plaintiff's conduct or allegations related to any of his banking relationship with Chase. At that time, the First Account had a deposit balance of approximately $261. Additionally, the Sapphire Card did not have any balance due.

33.     In or around October 2012, while in jail awaiting trial, Plaintiff provided his father a handwritten, notarized power of attorney ("POA"), that mentioned, *inter alia*, that he was in jail and could not manage his accounts personally at the moment. The POA provided his father with broad powers to take any action on Plaintiff's accounts related to the First Account and the Chase Sapphire Credit Card.

34.     In or around October 2012, Plaintiff's father walked into a Chase bank branch with the notarized POA. Plaintiff has no further knowledge of what transpired at the bank branch.

35.     In or around September 2013, Chase closed both the First Account and Sapphire Card.

36.     In or around February 2019, Plaintiff walked into a Chase bank branch in Schaumburg, IL upon discovering an unclaimed property with the California State Controller. A female employee of the branch assisted Plaintiff with having a $261 check re-issued to him. The employee stated to Plaintiff that the $261 amount was the leftover balance from the First Account upon closure of that account. Plaintiff asked the employee for the reason why it was closed, to which she stated that there was no particular reason stated other than a note that read that Plaintiff was not to be allowed to open any account with Chase.

37.     In or around October 2019, Plaintiff was added as an Authorized User to the following credit cards issued by Chase:

        a.   United Explore MileagePlus, with the primary account holder being his father

        b.   British Airways, with the primary account holder being his mother

        c.   Sapphire, with the primary account holder being his brother

38. On or around February 1, 2020, Plaintiff applied with Chase for a credit card ("Chase Credit Card").

39. On or around February 4, 2020, Plaintiff successfully opened a Business Checking Account under his own name at Chase. During this process, no underwriters were involved.

40. On or around February 15, 2020, John Doe #1 denied Plaintiff's Chase Credit Card application. John Doe #1, an employee of Chase, generated a false Statement of Reasons claiming that Plaintiff had insufficient credit history, when in fact Plaintiff had sufficient and substantial credit history with one of the highest credit ratings in the nation. The letter was transmitted by mail through the postal service as well as copy of it through electronic message to Plaintiff.

41. On or around April 4, 2020, Plaintiff applied for a Paycheck Protection Program ("PPP") loan with Chase under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), 15 U.S.C. § 116, et seq..

42. On or around April 17, 2020, John Doe #2, an employee of Chase, issued a letter to Plaintiff denying his PPP loan request, stating: "After a recent review of your accounts, we have decided to end our relationship with you." John Doe #2 generated such false Statement of Reasons, despite all of Plaintiff's prior accounts with Chase having been maintained in stellar condition. The letter was transmitted by mail through the postal service as well as copy of it through electronic message to Plaintiff.

43. On or around April 17, 2020, Chase issued a letter to Plaintiff's father, mother, and brother stating that it had closed the cards that were issued to Plaintiff as an Authorized User. It did not provide any reason whatsoever as to why the cards were terminated.

44.     On or around April 20, 2020, Plaintiff applied for an Amazon Prime Rewards Visa Signature Card ("Amazon Card") with Chase.

45.     On or around April 21, 2020, John Doe #3, an employee of Chase, upon manual review, issued a letter to Plaintiff regarding his Business Checking Account, which stated: "After a recent review of your account, we have decided to end our relationship with you." John Doe #3 generated such letter, despite the Business Checking Account having been maintained in stellar condition. The letter was transmitted by mail through the postal service as well as copy of it through electronic message to Plaintiff.

46.     On or around April 22, 2020, a co-conspirator of John Does 1-5, made a *human error* by failing to adhere to Chase's anti-felon policies and practices, when it approved Plaintiff's Amazon Card application with a $6400 credit line, despite the notation in the computer system that stated Plaintiff was a felon with whom Chase will not engage in business.

47.     On or around April 24, 2020, Plaintiff again added himself as an authorized user on his father's United Explore MileagePlus credit card as well as his mother's British Airways credit card. New cards were issued to Plaintiff for both credit cards.

48.     On or around June 1, 2020, John Doe #4, an employee of Chase, closed Plaintiff's Amazon Card under the guise that:1) there was a "rapid increase in revolving balances" and 2) there were "too many requests for credit or reviews of credit." John Doe #4 issued the letter despite the Amazon Card balance being paid in full on or before its due date, and there being no new information/credit-pull from which it could have determined that there were too many requests/review of credit. In fact, Plaintiff had on occasion even made *overpayments* of the balance due and thus has had a *negative* Amazon Card balance. The letter was transmitted by mail through the postal service as well as copy of it through electronic message to Plaintiff.

49. On or around June 1, 2020, Chase again sent letters to Plaintiff's father and mother, stating that it had closed the cards that were issued to Plaintiff as an Authorized User. It yet again did not provide any reason whatsoever as to why the cards were terminated.

50. On or around June 2, 2020, Plaintiff contacted Chase's customer service and requested it to reconsider and reinstate the Amazon Card

51. On June 4, 2020, John Doe #5, an employee of Chase, issued a letter denying reinstatement of the Amazon Card, yet again, under the same guise that: 1) there was a "rapid increase in revolving balances" and 2) there were "too many requests for credit or reviews of credit." In fact, on the very day of the denial letter, the Amazon Card had a current balance of *negative* $85.81. In the history of the Amazon Card, Plaintiff at most utilized just 16.25% of the approved credit limit. Moreover, John Doe #5 did not check any of Plaintiff's credit reports again through which it could glean new information that could form the basis of the denial. The letter was transmitted by mail through the postal service as well as copy of it through electronic message to Plaintiff.

## II. Anecdotes from Similarly-Situated Felons

52. Upon information and believe, in or around 2008, Kirk Radomski, a convicted felon with good credit history, had his credit card terminated that was issued to him by Chase, since Chase found out that he was a felon.

53. Upon information and believe, Unnamed Person #1 has a felony conviction stemming from conduct that occurred in 2017. In or around March 2020, this person applied for a credit card at Chase, was approved for it, but two weeks later received a letter that the account was terminated.

54. Upon information and believe, Unnamed Person #2 has a felony conviction and opened an account at Chase in or around March 2020; however, approximately 10 days later Chase closed the account.

55. Upon information and believe, Unnamed Person #3, a convicted felon, applied for and was approved for an Amazon Visa credit card issued by Chase in or around 2015. Approximately 5 months after its issuance and usage, the person received a letter in the mail stating that the Amazon Visa credit card was being closed because "continuing our relationship creates possible reputational risk for our company."

56. Upon information and believe, Unnamed Person #4, a convicted felon, applied for and was approved for a credit card issued by Chase in or around 2015. Approximately 6 months after regular use and payments, Chase cancelled it.

57. Exhibit B attached to this Amended Complaint provides further evidence of Chase's discriminatory policies and practices against people with felonies.

**III. Chase's Policies Prevents Any Applicant with a Felony Record from Being Considered for its Products and Services**

58. Chase practices and has non-public policies of terminating any and all banking relations with any person who it finds out has a felony.

59. Chase's policies and practices are an outwardly neutral practice that automatically excludes all applicants that have a felony conviction. These policies and practices are consistently applied and enforced.

**IV. Chase's Policies Prevent People with Felony Records from Obtaining Essential Banking Services**

60.     The harm inflicted by discriminatory felony records policies like Chase's is significant, not only in terms of the sheer number of people affected, but also in terms of the consequences, for the wellbeing of our communities.

61.     When banks categorically discriminate felons, they are left with no more choices but to revert back to criminal activity. Companies such as Chase never give felons a second chance. Thus, society ends up paying the price of Chase's discrimination.

62.     Banking services are essential and are a particularly crucial need for individuals reentering their communities immediately after time in prison.

63.     Research shows that success in opening a bank account and securing credit are critically important to allowing reentrants to gain employment, government benefits, and other community ties. Successful reintegration is not just a concern for those who return from prison: it is also a matter of public safety and economic necessity.[12] Reducing recidivism is critical for community safety; providing effective rehabilitation and skill development for those incarcerated and formerly incarcerated is critical to strengthening households and the economy. Other research has shown reentrants who do not have access to essential banking services are more likely to recidivate than those who are able to.[13] Recidivism additionally impacts the whole surrounding community.

64.     Automatic felony bans directly prevent reentrants from obtaining such essential banking services, whether immediately after release from prison or decades later, without giving any consideration to the particular circumstances of a person trying to cash a check or secure credit to start a legitimate business. Banks such as Chase that make it extremely difficult on reentrants to live a law-abiding life, unwittingly push them in the direction of recidivism. This

---

[12] https://www.ncjrs.gov/pdffiles1/nij/grants/230420.pdf
[13] https://www.dobs.pa.gov/For%20Media/Pages/Successful-Reentry.aspx

complete disregard for individual circumstances cannot be justified under the law. Moreover, it needlessly injures formerly incarcerated individuals, their communities, and organizations that are committed to preserving access to essential necessities of life.

65. Chase's choice to maintain the overly broad and discriminatory policies and practices also reflects a substantial departure from usual industry practices, which raises an inference of discriminatory intent. Chase's outright rejection of applicants with felony is entirely counter to normal business practices in the credit lending industry. In the normal course of business, creditors are highly motivated to get people in the door to obtain credit. Banks such as Chase even offer hundreds of dollars of cash and rewards incentives to people as an introductory bonus. Chase's policies and practices instead assure that a group of people - disproportionately people of color - has no reason to bank with Chase.

66. Departures like this from industry norms suggest illicit motive.

67. In light of these facts, there is no non-discriminatory explanation for why Chase deliberately choses and continues to implement the policies and practices over an individualized screening practice. Rather, these facts collectively support the inference - indeed, they strongly suggest - that Chase fully understands the unnecessary and unlawful disparate impact of its discriminatory impact.

68. In fact, Jamie Dimon, the Chief Executive Officer of Chase-company, has publicly said that "How we treat felons after they've paid their price is completely unfair."[14]

---

[14] https://www.bizjournals.com/atlanta/news/2018/07/23/jpmorgan-chase-ceo-in-atlanta-putting-felons-back.html

**V.     Chase's Policies Disproportionately Affects People of Color and Constitutes Unlawful Discrimination**

69.     Facially neutral credit lending practices that have a disparate impact on the basis of color are prohibited under the Equal Credit Opportunity Act unless they are necessary to achieve a substantial, legitimate, nondiscriminatory business interest that cannot be served through a less discriminatory alternative practice. Policies that automatically deny credit to people with records of felony, including Chase's policies and practices that are maintained and enforced by Chase, have a severe disparate impact on people of color at the national, state, and local levels, and are unlawful under this standard.

70.     Because the proportion of people with felony records in Cook County varies widely by skin color, Chase's policies and practices bars otherwise-qualified people of color from obtaining credit at a rate of close to two to three times the rate at which otherwise-qualified Whites are excluded. That is, for every White felon that is denied banking services, two or three non-White felons are denied as well. Chase's policies and practices are the direct cause of this disparate impact.

71.     Chase's policies are overbroad and cannot be justified. Protecting the bank's reputation, safety or property is not a valid reason for an automatic ban, as most credit-applicants with felony convictions do not pose a more significant risk to creditors than credit-applicants without felony convictions. The protection of the reputation of the bank cannot be used to justify a policy that categorically banks all people with felonies or other types of criminal history without any attempt to distinguish between past criminal conduct that presents a risk to Chase's assets or reputation and past criminal conduct that does not.

15

72.     Any legitimate concerns, including protecting safety or property, can be satisfied by a readily available and less discriminatory policy: giving individualized consideration to each applicant's circumstances and credit history.

## VI.     Automatic Credit Bans Based on Criminal History Disproportionately and Severely Impacts People of Color Nationally

73.     In April 2016, the United States Department of Housing and Urban Development ("HUD") released "Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" ("HUD Guidance").[15] That guidance notes that 100 million adults, nearly one-third of the U.S. population, have a criminal record of some kind. *Id.* at 1.

74.     Nationally, more than 625,000 inmates are released from confinement each year,[16] and they become targets of automatic felon bans at precisely the time then they need bank account and credit to reintegrate into society.[17]

75.     The sheer number of people released from prison every year has skyrocketed as the incarcerated population in the United States has grown from 300,000 in 1980 to more than 2.3 million today. Most are imprisoned for non-violent offences. Approximately 10 million misdemeanor cases are filed each year.[18] Approximately 19 million people across the country have at least one felony conviction.[19] At the same time that the sheer number of people with criminal convictions has dramatically increased, it has become much easier and more creditors to

---

[15] https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF

[16] E. Ann Carson and Elizabeth Anderson, U.S. Dept. of Justice, Prisoners in 2016, BJS Bulletin, 10 (Aug. 2018), https://www.bjs.gov/content/pub/pdf/p16.pdf

[17] https://csgjusticecenter.org/wp-content/uploads/2020/02/12.15.17_Making-Peoples-Transition-from-Prison-and-Jail-to-the-Community-Safe-and-Successful.pdf

[18] Alexandra Natapoff, Misdemeanors, 85 S. CAL. L. REV. 1313, 1314-1315 (2012).

[19] Pew Research Center, https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline /2018/01/02/felony-conviction-rates-have-risen-sharply-but-unevenly; Prison Legal News,

identify and ban people with criminal records because of the digitization of records and the concomitant growth of private companies that provide inexpensive background checks.

76. The massive increase in incarceration and in the number of people with criminal convictions has had an unequal impact on the non-White community. People of color are incarcerated at rates disproportionate to their numbers in the United States general population.

77. The fact that colored people are far more likely than Whites to have a felony record means that colored people are much more likely than Whites to be barred from credit by automatic exclusions of people with felony records.

78. Race and skin color are often times closely-related to each other. The Equal Employment Opportunity Commission's ("EEOC") analysis of the impact of automatic criminal history bans in the employment context further confirms the disparate impact described here. The EEOC analyzed national criminal records data, concluded that automatic criminal history bans have a disparate impact on the basis of race, and documented its findings in its Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964 ("Enforcement Guidance").[20]

79. The EEOC's conclusion applies to the disparate impact analysis here because categorical felony records bans operate the same way in credit as they do in employment. In both contexts, applicants are uniformly and permanently excluded, whether from credit opportunities or employment, before due consideration of the merits or qualifications of the applicant for the job or credit in question and without any individualized assessment of whether their felony record makes them personally unqualified. They are excluded solely on the fact of a prior conviction, regardless of whether they pose a current risk.

---

[20] 2012 WL 1499883 (Apr. 25, 2012). The prior versions from 1987 and 1990 reached the same conclusion and set forth the same presumption.

VII.    **Chase's Policies Disproportionately and Severely Impacts People of Color in Cook County, Illinois**

80.    Chase's automatic felony record ban has a disproportionate impact based on the color of a person's skin. Specifically, Chase's policies and practices disproportionately excludes otherwise-qualified non-White applicants.

81.    On the one hand, nationally, on average, 43 out of every 100 Americans with a felony record are White, whereas 57 out of every 100 Americans with a criminal record are of color. On the other hand, 76 out of every 100 Americans are White, whereas 24 out of every 100 Americans are of color.

82.    Based on this data, people of color are at least twice more likely than Whites to have a felony record. That is, the risk of disqualifying convictions among people of color is more than twice the times the risk of disqualifying convictions among White people.

83.    People of color seeking credit from Chase are thus substantially more likely than Whites to be harmed by Chase's policies and practices irrespective of the terms of credit.

84.    Chase's refusal to provide credit to people of color on its policies and practices directly causes a racially disparate, adverse impact on people of color.

85.    Chase's use of the non-public policies and practices means that applicants will never know the real reason why credit was denied.

86.    The statistical disparities here are extraordinary. That is, the difference in the rates at which colored applicants are adversely affected by the policies and practices is dramatically larger than the rate at which White applicants are affected. Moreover, these dramatic disparities are entirely foreseeable because of well-known disparities in the criminal justice system. As the

Supreme Court has explained, large statistical disparities are "often a telltale sign of purposeful discrimination[.]" *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977).

**VIII.  Chase's Broad Policies and Practices Cannot be Justified as Necessary for Protecting Safety, Assets, or Reputation**

87.   Extensive research establishes that protecting safety, assets or reputation does not justify a blanket felony records policy. The research shows that additional factors, such as the amount of time since the last offense, the person's age, and the type of conviction, must be considered to assess whether a past criminal conviction suggests a risk of future criminal conduct.

88.   It was in fact on that basis and the recommendation of the U.S. Probation Office, as determined by its categorization of very low risk, that this Court terminated Plaintiff's 3-year term of Supervised Release on the 1-year anniversary date from the commencement of supervision – a rare occurrence in criminal cases.

89.   The amount of time since the last offense is a critical factor in making this assessment. Studies show that in seven years or even less, the risk of future arrest for somebody with a past conviction becomes no greater than the risk for somebody without a past conviction.[21]

90.   Studies show that a person's age and the frequency of past criminal activity are also key factors in determining whether the individual poses any risk to safety, assets, or reputation. People with a criminal record who are older, and those with fewer criminal offenses, are much less likely to engage in future criminal conduct or to pose a threat to the community.

---

[21] Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 Criminology and Pub. Pol'y 483 (2006). See also Alfred Blumstein and Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks*, 47 Criminology 327 (2009).

91. Accordingly, safety, assets, and reputation do not provide a substantial and legitimate rationale for a broad blanket ban on eligibility like Chase's policies and practices.

**IX. Giving Individualized Consideration to Applicants' Circumstances Is a Readily Available and Less Discriminatory Alternative That Would Satisfy Any Substantial, Legitimate, Nondiscriminatory Interest Behind Chase's Policies and Practices**

92. Giving individualized consideration to each applicant's circumstances is a less discriminatory alternative to Chase's policies and practices. This would address any substantial, legitimate, nondiscriminatory justification for the policies and practices.

93. Specifically, to the extent safety, assets and reputational risks of Chase are a valid justification, protection of those concerns can be accomplished through the use of individual assessments that consider the nature of an individual's conviction, the amount of time since the conviction or release, and evidence of rehabilitation, among other factors. An individualized assessment allows people with a criminal record, but who pose no realistic current or future threat to Chase, to obtain credit. This more tailored approach both protects safety, assets, and reputation *and* is less discriminatory and exclusionary because it reduces the number of colored applicants who are categorically banned from obtaining credit from Chase.

94. In the analogous employment context, the EEOC recognizes that individualized assessments are almost always required by law because they provide a less discriminatory alternative to automatic criminal history bans and are sufficient to protect legitimate interests, including safety. Specifically, the EEOC's Enforcement Guidance advocates the use of "a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of

the job."[22] This screening should include "notice to the individual that he has been screened out because of a criminal conviction; an opportunity to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the additional information provided by the individual warrants an exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity."[23]

95.     Chase's overly broad policies and practices prevents any individualized consideration. But Chase would not have to compromise any legitimate concerns that they may have to give individualized considerations to applicants' particular circumstances and allow those individuals whose credit would not threaten safety, assets, or reputational interest of Chase.

96.     Chase's policies of automatically excluding people with felony convictions is not necessary to achieve a substantial and legitimate business interest.

## CHASE'S CHECKERED HISTORY OF LEGAL VIOLATIONS

**I. Federal Criminal Law Violations:**

97.     In January 2014, Chase entered into a *nolle prosequi* agreement with the United States for a $1.7 billion penalty stemming from two felony violations of the Bank Secrecy Act.

98.     In January 2017 Chase pled guilty in the District of Connecticut to one felony count of conspiring to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange (FX) spot market, in violation of 15 U.S.C. § 1. Chase was placed on a 3-year term of probation and $550 million in fines. Presumably, its term of probation expired in January 2020.

---

[22] *See* HUD Guidance at 7.
[23] Enforcement Guidance at 14

**II. Civil Law Violations:**

99.     In June 2010, Chase paid $48.6 million to settle claims by Great Britain's financial regulator that the bank's London unit failed to maintain required separation between customers' accounts.

100.     In July 2010, Chase paid $25 million to settle claims that it sold unregistered securities to a state-run municipal money-market fund that suffered a run on deposits because it held defaulted debt.

101.     In April 2011, Chase settled claims that the bank over-charged active or recently active military service members on their mortgages by paying $27 million in cash to approximately 6,000 military personnel, by lowering interest rates and fees in excess of that permitted by the Service Members Civil Relief Act ("SCRA") and the Housing and Economic Recovery Act of 2008 ("HERA") on soldiers' home loans, and by improperly foreclosing upon homes owned by borrowers protected by SCRA and HERA. Thereafter, additional borrowers were added to the class and Chase agreed to pay an additional $8 million into the settlement fund.

102.     In June 2011, Chase paid a penalty to the United States Securities and Exchange Commission ("SEC") of $153.6 million to settle charges that it failed to disclose material information to investors in collateralized debt obligations.

103.     In July 2011, Chase paid the SEC $228 million to settle charges that it fraudulently rigged at least 93 municipal bond transactions in 31 states, generating millions of dollars in profits.

104. In August 2011, Chase paid the U.S. Treasury Department $88.3 million to settle claims that it improperly processed transactions in violation of sanctions laws against Cuba, Iran and the Sudan.

105. In February 2012, Chase agreed to pay $110 million to settle claims that it over-charged customers for overdraft fees.

106. In March 2012, Chase paid $150 million to settle claims that it imprudently invested pension funds in a risky debt vehicle.

107. In March 2012, Chase paid the federal government a $45 million fine to settle a False Claims Act lawsuit that alleged it illegally charged veteran borrowers hidden fees on refinanced home loans backed by the Veterans Administration.

108. In April 2012, Chase paid $20 million to settle claims by the Commodity Futures Trading Commission that the bank improperly extended credit to Lehman Brothers based, in part, on commingled customer funds that it was required to keep separate.

109. In November 2012, Chase paid $296.9 million to the SEC to settle claims that the bank misstated information about the delinquency status of mortgages that served as collateral for a securities offering underwritten by the bank.

110. In December 2012, the United States District Court for the Southern District of New York granted final approval of a $43 million settlement of individual actions against JPMorgan Chase and another financial institution, as well as numerous other providers and brokers, alleging antitrust violations in the market for financial instruments related to municipal bond offerings.

111. On January 7, 2013, Chase settled claims with the Office of the Comptroller of the Currency ("OCC") and the Federal Reserve Bank providing for the termination of the

Independent Foreclosure Review programs that had been required under the Consent Orders with such banking regulators relating to its residential mortgage servicing, foreclosure and loss-mitigation activities. Under the settlement, the Chase agreed to make a cash payment of $760 million into a settlement fund for distribution to qualified borrowers. Chase also committed an additional $1.2 billion to foreclosure prevention actions under the settlement, which were to be be fulfilled through credits given to it for modifications, short sales and other types of borrower relief.

112. In July 2013, Chase paid $410 million to the Federal Energy Regulatory Commission to settle claims of bidding manipulation of California and Midwest electricity markets.

113. In September 2013, Chase agreed to pay $80 million in fines and $309 million in refunds to consumers who were billed for credit monitoring services that it never provided.

114. In September 2013, Chase also paid $920 million in fines to the Securities and Exchange Commission ("SEC"), the Federal Reserve Bank, the OCC, and the United Kingdom's Financial Conduct Authority to settle claims of mismanagement with respect to its oversight of traders involved in the "London Whale" disaster which caused losses of approximately $6 billion.

115. In October 2013, Chase paid a $100 million fine to the Commodity Futures Trading Commission and admitted to reckless conduct and market manipulation.

116. On October 25, 2013, Chase agreed to resolve, for $1.1 billion, litigation with Fannie Mae and Freddie Mac concerning mortgage repurchase obligations.

117.	On November 15, 2013, Chase settled claims for $4.5 billion with 21 major institutional investors to make a binding offer to the trustees of 330 residential mortgage-backed securities trusts issued by Chase and another financial institution.

118.	On November 19, 2013, Chase and the U.S. Department of Justice ("DOJ") reached a $13 billion settlement with Chase to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of residential mortgage-backed securities ("RMBS") by JPMorgan, Bear Stearns and Washington Mutual prior to Jan. 1, 2009.

119.	On December 2013, Chase reached a settlement with the European Commission regarding its Japanese Yen LIBOR investigation concerning antitrust rigging of benchmark interest rates and agreed to pay a fine of €79.9.7

120.	In December 2013, Chase paid $22.1 million to settle a lawsuit alleging that the bank imposed expensive and unnecessary flood insurance on homeowners whose mortgages the bank serviced.

121.	In January 2014, Chase paid a $350 million Civil Money Penalty to the OCC in connection with its violations of the Bank Secrecy Act.

122.	In January 2014, Chase also paid a $461 million Civil Money Penalty to the Financial Crimes Enforcement Network ("FinCEN") for failure to detect and adequately report suspicious transactions conducted by Bernard Madoff.

123.	In January 2014, Chase also paid $218 million to settle a class action brought by Bernard Madoff victims.

124.	In January 2014, Chase also paid $325 million to settle claims brought by the Bernard Madoff trustee.

125. In February 2014, Chase agreed to pay $614 million to the U.S. government to settle claims that it defrauded the Federal Housing Administration, the United States Department of Housing and Urban Development, and the United States Department of Veteran.

126. On March 25, 2014, Chase agreed to settle a class action alleging that it failed to pay overtime to its business bankers.

127. On March 27, 2014, Chase and the bankruptcy trustee for Peregrine Financial Group, Inc. agreed to a $15 million settlement of claims against Chase alleging Chase allowed fraud to occur at Peregrine, which was bankrupted after its founder looted hundreds of millions of dollars from customer accounts.

128. On April 23, 2014, Chase agreed to pay $5.5 million to settle claims made by a class of nearly 480,000 Circuit City rewards credit card holders who alleged Chase duped them into joining an "interest free" program, then breached their contract by charging class members unexpected fees and interest charges.

129. On May 1, 2014, a Chase's subsidiary, JP Morgan Securities, LLC, agreed to settle claims brought by the state of New Jersey, Division of Consumer Affairs and Bureau of Securities, alleging that it allowed unregistered agents to accept orders for the purchase and sale of securities.

130. On May 2, 2014, the United States District Court for the Eastern District of New York gave preliminary approval to a settlement of $280 million to resolve claims against Chase that it misled investors in billions of dollars' worth of mortgage backed securities.

131. On July 15, 2014, a federal court approved a roughly $2.25 million settlement between Chase and a class of consumer who alleged that Chase charged them late fees on their mortgage payments even when they were on time.

132.    On October 8, 2014, Chase agreed to pay up to $12 million to settle claims that certain of its tellers and other bank employees – a total of approximately 145,000 employees in 12 states – were not paid proper wages or overtime because Chase did not count some hours worked.

133.    On October 10, 2014, Chase agreed to pay $2.4 million to resolve claims that it illegally misclassified commercial real estate appraisers as exempt workers in order to avoid paying them overtime.

134.    In November 2014, Chase agreed to pay nearly $1 billion to U.S. and U.K. regulators who alleged that Chase, and others, manipulated the $5.3-trillion-a-day currency market.

135.    On January 22, 2015, Chase settled claims by the Consumer Financial Protection Bureau and the Maryland Attorney General alleging that Chase steered customers to a now-defunct Maryland title company in exchange for undisclosed kickbacks and data on potential customers in violation of federal consumer protection laws.

136.    On April 2, 2015, Chase agreed to settle claims that it failed to pay overtime and provide proper breaks to a California class of underwriters.

137.    On May 28, 2015, Chase agreed to pay over $500 million to settle a lawsuit arising from Bear Stearns - which Chase purchased in 2008 - for the sale of $17.6 billion in toxic mortgage backed securities.

138.    On July 17, 2015, Chase agreed to pay $388 million to settle claims by investors who alleged that Chase misled them about the safety of $10 billion worth of residential mortgage backed securities.

139. On July 29, 2014, Chase agreed to settle charges brought against it by the Commodity Futures Trading Commission for filing inaccurate reports to the agency from 2012 and continuing even after the charges were brought against Chase.

140. On January 31, 2015, Chase agreed to pay $99.5 million to settle claims by a class of investors who alleged that Chase, along with twelve other banks, conspired to rig the $5.3 trillion-a-day foreign exchange market.

141. On August 12, 2015, a federal court approved a settlement of a nationwide class action against Chase for its use of robocalling in violation of the Telephone Consumer Protection Act.

142. In October 2015, Chase entered into a $10.2 million settlement for a nationwide class of persons who were "robodialed" by Chase in violation of the Telephone Consumer Protection Act.

143. On October 14, 2015, Chase agreed to settle charges with the SEC that it violated a rule prohibiting firms from taking part in public stock offerings after short selling the same stocks.

144. On October 29, 2015, Chase settled a multi-district litigation alleging that Chase and eleven other market participants rigged the credit-default swaps market.

145. On November 2, 2015, Chase agreed to pay $100 million in restitution and penalties to settle a lawsuit by the California attorney general against Chase over the bank's consumer credit card debt-collection practices, including allegations it was "robosigning" thousands of documents.

146. On December 15, 2015, Hong Kong regulators fined Chase $3.87 million for various regulatory failures relating to internal controls on short-selling, dark pool trading, and other types of trading.

147. On December 18, 2015, Chase agreed to settle claims with the SEC and the CFTC for failing to disclose conflicts of interest while steering clients into its own hedge funds and mutual funds.

148. On January 4, 2016, Chase entered into a consent order with the Office of the Comptroller of the Currency to pay a $48 million fine for its violations of a 2011 consent order with the OCC arising from its "robosigning" of loan documents and other unsafe and unsound banking practices.

149. On January 6, 2016, Chase's brokerage business agreed to settle charges with the SEC that it falsely misled its clients about how its brokers are compensated.

150. On January 19, 2016, Chase reached a class action settlement on behalf of Chase's shareholders who alleged suffering losses as a result of the bank's supplying false and misleading statements concerning the risks and losses arising from the secret proprietary trading activities of the "London Whale," a rogue London-based Chase trader who caused the bank to suffer $6.2 billion in losses.

151. On January 25, 2016 Chase settled two outstanding disputes with Lehman Brothers Holdings Inc. and certain of its affiliates in which Lehman alleged, inter alia, that Chase coerced several billion dollars from Lehman on the eve of its bankruptcy, draining Lehman of virtually all liquidity and leading a bank run that ultimately led to Lehman's bankruptcy.

152.    On July 8, 2016, Chase agreed to pay at least $216 million and reshape its credit card debt collection operations as part of a settlement with the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency and 47 states.

153.    The above stated violations from 2010 to mid-2016 that Chase agreed and settled are only a select handful. Chase has agreed and settled to dozens more violations of the law, since 2016 till date, which ranged from banking violations to employment and non-employment discriminatory practices. For instance, on January 20, 2017, pursuant to a Consent Order entered, in the Southern District of New York, Chase resolved allegations by the United States that it had violated the ECOA, *inter alia*, when it discriminated African-Americans and Hispanics on the basis of race and national origin in the extension of residential credit and in the making of residential real estate-related loans through mortgage brokers, by agreeing to pay a $54.3 million civil penalty.

## INJURY TO PLAINTIFF

154.    As a result of Chase's actions described above, Plaintiff has been directly and substantially injured. Plaintiff has been frustrated in his attempt to maintain a deposit account and obtain credit.

155.    Chase bank is everywhere. It is the largest bank in the United States. It has over 5,000 branches that covers every State in the nation. Many major companies such as Amazon.com, United Airlines, Southwest Airlines, Marriott Hotels, Disney, Starbuck, etc. have their credit cards issued through Chase. It has essentially turned itself into Evil Corp - a trope used in the USA Network's hit television show Mr. Robot. It has become an indispensable bank in most Americans' day-to-day lives.

156.    Transitioning to a different bank will lead Plaintiff to access to fewer fee-free ATMs, different service fees, interest rates, and other such distinctive effects.

157.    The denial of credit on two different occasions led to Chase checking Plaintiff's credit history thrice. Each check led to a drop in his credit score and appears as a credit-seeker to subsequent creditors. The termination of the Amazon Card by Chase led to a display of short account history on his credit report. All factors in combination significantly alters his credit reports to the point that subsequent lenders will view him as a riskier applicant than he really is.

158.    Because Chase's policies and practices have had and continue to have the effect of banning people with felony records, who are disproportionately of color, from obtaining credit, Chase's conduct frustrates Plaintiff's livelihood and opportunity to obtain credit equal to his White counterparts, and free of arbitrary barriers.

159.    Plaintiff has been damaged by having to divert his assets elsewhere. Moreover, due to the COVID-19 stay-at-home orders, it is now harder than ever to locate a bank that will open a new account at a branch.

160.    On May 26, 2020, Plaintiff's business was officially approved as a federal contractor to the government of the United States and was assigned a Commercial and Government Entity Code by the Department of Defense Logistics Agency. However, after the termination of the Amazon Card, Plaintiff did not have access to any credit card to do business as a federal contractor. Without the line of credit that Plaintiff was previously authorized in the Amazon Card, he was no longer able to submit bids as a contractor due to his inability to fulfill any Purchase Orders of the government as a federal contractor.

161. As a direct and proximate result of Chases' denial of the PPP loan, Plaintiff lost $12,117 in loans that he would have otherwise been approved of by the U.S. Small Business Administration.

162. As a direct and proximate result of Chases' denial of the Amazon Card, Plaintiff lost a $6,400 line of credit. Moreover, the Amazon Card offered 5% cashback on purchases made at Amazon.com & Whole Foods, in addition to its 2% cashback on all other purchases – monetary rewards that Plaintiff has lost.

163. As a direct and proximate result of Chases' denial of the Chase Credit Card, Plaintiff lost an indeterminate line of credit, worth at least $1.

164. But for the series of denials of the various banking services of Chase, Plaintiff had to invest a substantial amount of time and money to relocate his assets.

165. Chase's discriminatory conduct, if continued, lead Plaintiff to lose business as a government contractor and the income that would have been generated thereof.

166. Chase's unlawful actions described herein have been intentional, willful, wanton, outrageous, fraudulent, grossly negligent, malicious, and have been, and are, implemented with callous and reckless disregard for rights protected under federal and state law.

## CAUSES OF ACTION

**COUNT I – Conspiracy to Conduct or Participate in an Enterprise Engaged in a Pattern of Racketeering Activity, 18 U.S.C. § 1962(d)**

167. Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 166 above.

168. The predicate acts stated herein all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

169. The enterprise alleged herein also engaged in legitimate business activities beyond those necessary to carry out the alleged acts of racketeering.

170. Plaintiff was a victim of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

171. All of the predicate acts described herein were continuous as to form a pattern of racketeering activity in that 1) John Does 1-5 engaged in the predicate acts over a substantial time; or 2) the patterns of racketeering activity engaged in by John Does 1-5 continues or threatens to continue because such conduct has become a regular way of on-going business activities.

172. As a direct and proximate result of, and by reason of, the activities of John Does 1-5 and their conduct in violation of 18 U.S.C. § 1962(a), (b), (c), and (d), Plaintiff has been injured in his business and property, within meaning of 18 U.S.C. § 1964(c) and is, therefore, entitled to recover threefold the damages sustained to him, with the cost of the suit, including reasonable attorneys' and experts' fees.

### The Enterprise, Chases, and Co-Conspirators

173. Chase maintains and continually updates its criminal convictions database. This database does not contain all criminal records from all the various jurisdictions within the United States.

174. Since Chase does not maintain a database of all felony convictions in the United States, upon discovery of such felony-related information, it terminates existing Chase accounts and any future relationship with such felons.

175. Chase terminates accounts and relationships with felons – whether currently incarcerated or not. Having mitigated such *perceived* risks, Chase continues to maintain

relationships with non-felon incarcerated individuals – such as misdemeanants and pretrial detainees. The relationship with these non-felon incarcerated individuals is governed by its Incarcerated Individuals policy, which is distinct from its anti-felon policies. Also distinct from its anti-felon policies is its Extraordinary Life Events policy.

176. Underwriting services are provided by some large financial institutions, such as banks, insurance companies and investment houses, whereby they guarantee payment in case of damage or financial loss and accept the financial risk for liability arising from such guarantee. An underwriting arrangement may be created in several situations including insurance, issues of security in a public offering, and bank lending, among others. The person or institution that agrees to sell a minimum number of securities of the company for commission is called the Underwriter. In banking, underwriting is the detailed credit analysis preceding the granting of a loan or credit card, based on credit information furnished by the borrower.

177. Consumer credit card and loan underwriting includes the verification of such items as employment history, salary and financial statements; publicly available information, such as the borrower's credit history, which is detailed in a credit report; and the lender's evaluation of the borrower's credit needs and ability to pay.

178. Of late, the discourse on underwriting has been dominated by the advent of machine learning in this space. These profound technological innovations are altering the way traditional underwriting scorecards have been built and are displacing human underwriters with automation. For instance, natural language understanding by computers allows the consideration of more sources of information to assess risk than used previously.

34

179.    Automated underwriting is utilized in various capacities across the lending market and can be used in all types of loans. It is primarily used with conventional loans that include a standard underwriting procedure and basic amortization schedule for installment payments.

180.    Chase has integrated an automated underwriting platform. It automates loan applications for credit cards, personal loans, auto loans, and mortgages, among others.

181.    Its automated underwriting platform uses basic loan application information to retrieve relevant data, such as a borrower's credit history. From there the automated platform processes a borrower's information through a programmed underwriting process that instantly arrives at a loan decision. It has the capability to provide instant outputs that can generally take up to 60 days to complete with manual processing. It also has the capability to flag and refer applications to manual underwriting, for certain verifications in the final phases of the lending process. When manual underwriting is necessitated, human interaction is typically required to verify some inputs such as income and assets.

182.    Chase's automated underwriting system – using a combination of personally identifiable information - has flagged Plaintiff as an individual for manual processing. Sometimes, humans make errors too.

183.    The Chase Underwriting Team ("CUT") is comprised of John Does #1 through 4, and Co-Conspirators 1 through 10 ("CC"), each of whom are employed by Chase as underwriters. The CUT constituted an "enterprise" within the definition of Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

184.    John Doe #1 was an employee of Chase through its subsidiaries and affiliates, and was employed on, and associated with, the above-described enterprise, the CUT.

35

185.    John Doe #2 was an employee of Chase through its subsidiaries and affiliates, and was employed on, and associated with, the above-described enterprise, the CUT.

186.    John Doe #3 was an employee of Chase through its subsidiaries and affiliates, and was employed on, and associated with, the above-described enterprise, the CUT.

187.    John Doe #4 was an employee of Chase through its subsidiaries and affiliates, and was employed on, and associated with, the above-described enterprise, the CUT.

188.    John Doe #5 was an employee of Chase through its subsidiaries and affiliates, and was employed on, and associated with, the above-described enterprise, the CUT.

189.    The CCs were employees of Chase through its subsidiaries and affiliates, and were employed on, and associated with, the above-described enterprise, the CUT.

190.    Each John Doe 1-5 is a RICO "person" within the meaning of 18 U.S.C. § 1961(3) because each is an individual capable of holding a legal or beneficial interest in property.

## The Racketeering Conspiracy

191.    Since at least 2008 till date, the exact dates being unknown to Plaintiff, in the Northern District of Illinois, Eastern Division, and elsewhere, the John Doe #1-5, together with their CC, being persons employed by Chase and associated with the CUT enterprise at Chase, an enterprise which engaged in, and the activities of which affected interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(a), (b) & (c), that is, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern on racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1981(5); to acquire and maintain, directly and indirectly, interest and control of the enterprise through a pattern of racketeering

36

activity; to receive and use income and proceeds of income, directly and indirectly, from a pattern of racketeering activity to acquire interest and engage in the operations of the enterprise; in consisting of multiple acts which are indictable under the following statutes:

192.    Title 18, United States Code, Section 1343 (wire fraud)

193.    Title 18, United States Code, Section 1341 (mail fraud)

194.    It was a part of the conspiracy that each Doe agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise. Each conspirator knowingly agreed to facilitate the operation of the CUT enterprise through a pattern of racketeering activity.

## Purposes of the Racketeering Conspiracy

195.    The purposes of the racketeering conspiracy included the following, among others:

a)  Maximizing profits and minimizing perceived losses for Chase by sending letters containing false reasons for denying or terminating applicants of Chase's checking and/or credit products;

b)  Promoting and enhancing the racketeering conspiracy and the activities of John Does 1-5 and their co-conspirators;

c)  Generating false Statements of Reason to mislead credit applicants like Plaintiff into believing that they were true;

d)  Maintaining their position and income through the unlawful activities, and eventually rise through the ranks of the enterprise; and

e)  Concealing the unlawful activities of John Does 1-5 and their co-conspirators from scrutiny by applicants, bank regulators, and law enforcement.

37

**Means and Methods of the Racketeering Conspiracy**

196.    The means and methods by which John Does 1-5 and their co-conspirators sought to, and did, achieve the purposes of the racketeering conspiracy included the following:

197.    At times, John Does 1-5 and their co-conspirators would select random reasons from a set of commonly used statements from its computer database. At other times, they would manually type the reason for account denial, termination, or closure.

198.    After the false Statement of Reasons was prepared, John Does 1-5 and their co-conspirators would transmit the computer-file either as an electronic message to its victims or through a vendor of printing and mailing facility that would help facilitate the distribution of the false Statement of Reasons

199.    John Does 1-5 and their co-conspirators intentionally sent such letters containing fraudulent Statement of Reasons (hereinafter "false letters"), thousands of times to thousands to victims. In transmitting such false letters by means of mail and wire, John Does 1-5 and their co-conspirators, believed they were helping the enterprise and Chase mitigate perceived losses, and therefore increase profitability for Chase, to retain their salaried positions, and eventually rise through the ranks within the enterprise.

200.    The false and misleading letters were intended to, and at times did, trick Plaintiff and other victims into believe that their credit history was subpar, and accounts were delinquent, among other things. Each false letter provided Plaintiff and other victims the false impression as to the true nature of the denial or termination, so that Plaintiff and other victims, charged with such false information, would not further pursue legal remedies, Congressional inquiries or investigations, or regulatory investigations.

201.     By sending the false letters, John Does 1-5 and their co-conspirators believed that applicants or account holders that fell within certain categories, or that appeared to be risky, or those with felonies ( who are predominantly people of color), were highly likely to cause losses to the enterprise and ultimately Chase, and thus reducing Chase's profitability and their own individual salaries and bonuses.

202.     The false letters were usually sent to the victims in order to circumscribe revelation of the extraneous information that formed the basis of the true reason for denial or termination.

203.     John Does 1-5 and their co-conspirators also sent each false letter, usually, in order to fraudulently comply with 15 U.S.C § 1691(d)(2)(A) and 12 C.F.R. § 1002.9(b)(2)'s requirement that credit applicants be provided "specific reason" which would "indicate the principal reason(s) for the adverse action." They transmitted those false and material misrepresentations, which were reasonably calculated to deceive persons of ordinary prudence and intelligence.

204.     Instead of providing applicants the true and principal reason that they were being denied credit due to their felonies or other criminal histories, John Does 1-5 and their co-conspirators instead chose to falsify these principal reasons.

**Acts in Furtherance of the Racketeering Conspiracy**

205.     In furtherance of the racketeering conspiracy, and to achieve its purposes, John Does 1-5 and their co-conspirators committed and caused to be committed the following acts, among others, in the Northern District of Illinois, Eastern Division, and elsewhere:

206. On or around February 15, 2020, John Doe #1 denied Plaintiff's Chase Credit Card application. John Doe #1, and transmitted a false letter claiming that Plaintiff had insufficient credit history.

207. On or around April 17, 2020, John Doe #2, transmitted a false letter to Plaintiff denying his PPP loan request, stating: "After a recent review of your accounts, we have decided to end our relationship with you."

208. On or around April 21, 2020, John Doe #3 transmitted a false letter to Plaintiff regarding his Business Checking Account, which stated: "After a recent review of your account, we have decided to end our relationship with you."

209. On or around June 1, 2020, John Doe #4, closed Plaintiff's Amazon Card and transmitted a false letter to him, which stated:1) there was a "rapid increase in revolving balances" and 2) there were "too many requests for credit or reviews of credit."

210. On June 4, 2020, John Doe #5, transmitted a false letter to Plaintiff, denying reinstatement of the Amazon Card, stating: 1) there was a "rapid increase in revolving balances" and 2) there were "too many requests for credit or reviews of credit."

211. Since at least 2008 through present, John Does 1-5 and their co-conspirators have transmitted thousands of such false letters to thousands of victims – the true extent of which can only be determined after analyzing the Chases' records. See Exhibit C for written accounts of various fraud victims.

212. John Does 1-5 and their co-conspirators intended for Plaintiff and others to rely on the false statements.

213. John Does 1-5 and their co-conspirators intend to continue sending Plaintiff and other applicants such false letters upon presentment of any future credit or checking account

application. Furthermore, John Does 1-5 and their co-conspirators past practices and actions that span well over a decade, give rise to an inference that they are reasonably likely to engage in similar unlawful conduct in the future. Accordingly, there is a reasonable likelihood that John Does 1-5 and their co-conspirators will continue to violate 18 U.S.C. § 1961, et seq. in the future.

214. John Does 1-5, devised and intended to devise a scheme to defraud Plaintiff, when they transmitted or caused to be transmitted each false letter by means of mail and/or wire communications in interstate and/or foreign commerce with the intent to execute such scheme.

215. John Does 1-5 and their co-conspirators conspired to devise and intended to devise a scheme to defraud Plaintiff, by transmitting or causing to be transmitted false Statements of Reasons by means of mail and/or wire communications in interstate and/or foreign commerce with the intent to execute such scheme.

216. The predicate offenses are related to each other and to the affairs of the CUT enterprise. The predicate offenses were committed by John Does 1-5 and their co-conspirators and directed towards Plaintiff and other victims in order the achieve the goals of denying Chase's checking and/or credit products.

217. All in violation of Title 18, United States Code, Section 1962(d).

**COUNT II – Disparate Impact in Violation of the ECOA, 15 U.S.C. § 1691(a)(1)**

218. Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 217 above.

219. Chase's acts, policies and practices have an adverse and disproportionate impact on people of color as compared to similarly-situated Whites. This adverse and disproportionate impact is the direct result of Chase's policies and practices, which automatically denies credit to

41

people with a felony record without considering the applicant's individual characteristics and circumstances.

220.    To wit, Chase discriminated Plaintiff on the basis of color when he applied for and was denied or terminated for the Paycheck Protection Program, the Chase Credit Card, and an Amazon Card.

221.    Chase's policies and practices were not and are not necessary to serve any substantial, legitimate, nondiscriminatory interest, and any such interest could be satisfied by another practice – providing individualized consideration – that would have a less discriminatory effect.

222.    Chase's acts, policies, and practices constitute discrimination and violate the ECOA and its implementing regulations, in that Chase's acts, policies, and practices constitute a refusal to lend credit because of color, and have made obtaining credit unavailable because of color, in violation of 15 U.S.C. § 1691(a)(1).

**COUNT III – Failure to Provide Principal and Specific Reasons in Violation of the ECOA, 15 U.S.C. § 1691(d)(2); 12 C.F.R. § 1002.9(b)(2)**

223.    Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 222 above.

224.    ECOA and the regulations promulgated thereunder, require Chase to provide Plaintiff 1) the "principal" reason for the adverse action, and 2) that they be the "specific reasons" for the adverse action.

225.    Chase denied or terminated Plaintiff's Paycheck Protection Program loan application, Chase Credit Card application, and twice the Amazon Card (collectively, "applications") without a statement of providing the principal and specific reasons to him.

226.  Alternatively, Chase never provided Plaintiff a disclosure of his right to a statement of specific reasons.

227.  The denial or termination of each of these applications constitutes an "adverse action" within meaning of 15 U.S.C. § 1691(d)(6). Chase was a "creditor" within meaning of 15 U.S.C. § 1691a(e). Plaintiff was an "applicant" for each of the applications within meaning of 15 U.S.C. § 1691a(b).

228.  Each of these Statement of Reasons for the adverse action on the applications failed to meet requirements under the ECOA. Chase provided Plaintiff with *sham* reasons, which were neither the principal nor the specific reasons for the adverse actions. In fact, the principal and specific reason was that Plaintiff was a felon – and no other reason.

229.  Closing accounts without stating the principal and specific reasons casts doubts of discrimination. Consumers may never know whether race, color, religion, national origin, sex or marital status, age or other prohibited bases were involved. By failing to provide applicants the valid reasons, they may never know what remedial actions to take. Or worse, they might use the false reasons to their own detriment. For instance, applicants being notified falsely that they have too many recent inquiries would probably wait months before they reapply with other creditors.

230.  The ECOA adverse action notice requirement was enacted as "a strong and necessary adjunct to the anti-discrimination purpose" of the statute and to "fulfill[] a broader need: rejected credit applicants will now be able to learn where and how their credit status is deficient and this information should have a pervasive and valuable educational benefit." S. REP. No. 94- 589, at 406, 408, 1976 WL 13838, at *4, *7 (Jan. 21, 1976).

231.  In addition to discouraging discriminatory practices, the notice requirement is intended to provide consumers with a "valuable educational benefit" and to allow for the

43

correction of errors "where the creditor may have acted on misinformation or inadequate information." *Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 576 (6th Cir. 2016) (*quoting* S. Rep. No. 94-589, at 4 (1976)).

232.    Chase's acts and omissions constitute a violation of the ECOA and its implementing regulations under of 15 U.S.C. § 1691(d)(2).

**COUNT IV – Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (Against Chase)**

233.    Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 232 above.

234.    815 ILCS 505/2 makes it an unfair or deceptive act or practice to engage in any activity that violates the Consumer Fraud and Deceptive Business Practices Act ("CFA").

235.    Plaintiff meets the ICFA definition of "consumer." See 810 ILCS 505/1.

236.    While engaged in trade or commerce, Chase has committed unfair and deceptive acts or practices under the CFA. Throughout the years, Chase has sent false letters to Plaintiff and other consumers, by the means of mail or electronic notice, in which it claimed that its decision was based on certain credit history factors, account-related factors, or other false factors, when said claims were made in order to either fraudulently satisfy the principal and specific reason under 15 U.S.C. § 1691(d)(2) and 12 C.F.R. § 1002.9(b)(2), conceal embarrassing internal non-public policies, or other reasons.

237.    Chase used fraud, deception, and misrepresentation in its attempt to dissuade certain people or categories of people, including Plaintiff, from accessing its credit and checking products.

44

238. The false letters that Chase sent were inherently fraudulent, deceptive, and grossly misrepresented, and it intended for Plaintiff and others to rely upon the concealed, suppressed, and omitted material facts.

239. Chase's conduct in relation to Plaintiff's denial, rejection, and termination was willful, malicious, unfair, arbitrary, and designed to lead him to believe that he negative account history, poor credit history, or unusually high expenditures.

240. Chase's actions are immoral because at numerous times it outright lied to Plaintiff when facts were crystal clear to both parties. For instance, when it claimed in the second Amazon Card denial letter that Plaintiff had rapid increases in revolving balance, Chase's own records reflected that the balance was in the negative – that is, Chase owed Plaintiff money *on a credit card!*

241. Chase's actions caused substantial injury to Plaintiff and to consumers generally, as Plaintiff and consumers reasonably expect large financial institutions to comply with the law. In its stead, Plaintiff and consumers generally received false sense of personal insecurities.

242. In transmitting each of the aforesaid letters in trade or commerce, Chase used and employed deceptive fraud and false pretenses with the intent that Plaintiff and other consumers rely upon the deception.

## DEMAND FOR JURY TRIAL

243. Under Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

**REQUESTED RELIEF**

244.   Plaintiff respectfully asks that the Court grant him the following relief:

a.   Enter a declaratory judgment finding that the foregoing actions of Chase and John Does 1-5 violate 15 U.S.C. § 1691, 18 U.S.C. §§ 1962(d), and the Illinois Consumer Fraud and Deceptive Business Practices Act.

b.   Enter a permanent injunction:

   i.   Enjoining Chase and its employees, agents, officers, and directors from implementing and enforcing the illegal, fraudulent, and discriminatory conduct described herein;

   ii.   Directing Chase and its employees, agents, officers, and directors to revise its policies and practices, to reduce the adverse and disproportionate effect it causes on the basis of color and make it consistent with the Equal Credit Opportunity Act; and

   iii.   Directing Chase and its employees, agents, officers, and directors to take all affirmative steps necessary to remedy the effects of the illegal, fraudulent, and discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

c.   Award compensatory damages against each Defendant, jointly and severally, to Plaintiff, in an amount to be determined by the jury that would fully compensate Plaintiff for injuries caused by the conduct of Defendants alleged herein;

d.   Award punitive damages, against each Defendant, jointly and severally, to Plaintiff, in an amount to be determined by the jury that would punish Defendants

for their willful, wanton, outrageous, malicious, grossly negligent, fraudulent and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

e.  Award Plaintiff his reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c)(2);

f.  Award prejudgment interest to Plaintiff; and

g.  Order such other relief as this Court deems just and equitable.

Dated: September 1, 2020

Respectfully submitted,

/s/ Vivek Shah

Vivek Shah
236 Woburn Ln
Schaumburg, Il 60173

## **VERIFICATION OF COMPLAINT**

I, Vivek Shah, hereby declare under penalty of perjury that the foregoing facts contained in this Complaint are true and correct to the best of my knowledge.

Executed on September 1, 2020

/s/ Vivek Shah
VIVEK SHAH

47